Submitted August 23, 2016, affirmed April 12, petition for review denied June 29, 2017 (361 Or 645)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JOSE VAZQUEZ FLORES,
aka Jose Vasquez-Flores,
aka Jose Vasquezflores,
aka Jose Vasquez Flores,
*Defendant-Appellant.*

Lane County Circuit Court
201411281; A158090

395 P3d 73

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Meredith Allen, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Shannon T. Reel, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and DeHoog, Judge, and Flynn, Judge pro tempore.

## DEHOOG, J.

In this criminal case, defendant challenges his convictions for two counts of first-degree unlawful sexual penetration, ORS 163.411, two counts of first-degree sodomy, ORS 163.405, two counts of first-degree rape, ORS 163.375, and two counts of first-degree sexual abuse, ORS 163.427. In his sole assignment of error, defendant contends that the trial court erred in admitting, pursuant to the common-law curative admissibility doctrine, conclusions from a crime lab report regarding DNA analysis of the victim's clothing. The state argues that the conclusions from the crime lab report were admissible, but, in any event, any error in admitting those conclusions was harmless. For the reasons discussed below, we conclude that, if the trial court did err in admitting that evidence, that error was harmless. Accordingly, we affirm.

In determining whether the erroneous admission of disputed evidence was harmless, we review all pertinent portions of the record. *State v. Basua*, 280 Or App 339, 340, 380 P3d 1196 (2016). We state the following facts consistently with that standard.

Defendant's criminal charges arose from sexual conduct involving his niece, E, alleged to have occurred between May 29, 2011 and September 16, 2013. E was between six and eight years old at the time. Defendant and his wife, E's aunt, often babysat E, and defendant frequently assisted E with her homework. E also periodically stayed overnight at defendant's home and, on those occasions, would sleep with her aunt and defendant either on the floor of their bedroom or in their bed. Suspicions of defendant's sexual offenses arose on September 16, 2013, when defendant was helping E with her homework at his home. E's other aunt, Flore, was also present, but went outside to take a phone call. When she came back inside, Flore noticed that defendant's and E's shadows on the dining room wall made it appear as though defendant was in a kneeling position in front of E. When Flore entered that room, defendant and E quickly separated and went to opposite sides of the table where they had been working. Defendant and E appeared nervous to Flore. Flore's observations made her uncomfortable, and she immediately

took E home. On the drive to E's home, Flore asked her what she had been doing with defendant; E ultimately disclosed to Flore that defendant had sexually abused her on that and other occasions. After Flore dropped E off at her home, her mother followed up with additional questioning at Flore's urging. E's mother subsequently called the police. When officers arrived, they collected the clothing that E had been wearing at defendant's home.

The state's theory at trial was that defendant had committed a series of sexual offenses against the victim during a three-year period beginning when she was approximately six years old. Unlike some of defendant's other sexual offenses against E, the state believed that both defendant and E had remained fully clothed during the sexual abuse that Flore had walked in on. As to the clothing that E had worn that day, a state's witness, Detective Williams, testified without objection that a state police crime lab report indicated that no bodily fluids—such as semen or saliva—had been recovered from those clothes. In light of that testimony, the state did not anticipate offering DNA evidence related to such fluids or, for that matter, any DNA evidence. On cross-examination of Williams, however, the following colloquy occurred:

"[DEFENDANT]: *** [S]o you didn't find any DNA evidence that links [defendant] to sexual abuse?

"[WILLIAMS]: No, I did not.

"[DEFENDANT]: *** [W]as it also checked for touch DNA?[1]

"[WILLIAMS]: It was in a second submission.

"[DEFENDANT]: Okay, but there is no evidence at this point in time [that links defendant] to, in any way, to the clothing that she was wearing?

"[WILLIAMS]: That's correct."

The state did not object to defendant questioning Williams about the crime lab report. On redirect, however, the state

---

[1] Based on Williams's testimony on direct-examination and in the offer of proof, we understand "touch DNA," as that term was used in this case, to mean the transfer of cells resulting from mere proximity or through physical contact not involving the exchange of bodily fluids.

asked Williams whether any touch DNA that was "foreign" to E had been found on her clothing; that is, whether there had been any DNA from any source—such as skin cells—on E's clothing that was not her own DNA. Defendant objected, apparently anticipating that Williams would answer that touch DNA of an unknown male had been found, but not tested.

In response to defendant's objection that, among other things, Williams's testimony regarding those crime lab results would be hearsay, the state made an offer of proof outside the presence of the jury. The state argued that defendant had opened the door to questioning about the presence of foreign touch DNA on E's clothing. The state explained that it intended to ask Williams whether the state crime lab had found and tested any foreign DNA to determine whether it belonged to defendant. The state anticipated that Williams's testimony would be that, because E spent a significant amount of time in defendant's home and sat close to him when she did her homework, defendant's touch DNA would likely be found on her clothing even if defendant had not subjected her to sexual contact. Therefore, the state explained, Williams would testify that the presence or absence of touch DNA had very little significance in defendant's case. Nonetheless, the state contended, it was entitled to correct any misperception on the part of the jury that the touch DNA that the crime lab found could *not* belong to defendant. Defendant responded that his question on cross-examination as to whether there was "any DNA evidence that links [defendant] to sexual abuse" did not open the door to the state's proposed line of questioning. The trial court concluded otherwise, stating that

> "the door has been opened to be able to at least address [the foreign DNA] in the context in which Detective Williams is going to answer [as to] the efficacy of [what] that test[ing] would have been—nothing more than that the child was in a vicinity in the home in which those cells could have been picked up at any time rather than [only through] sexual contact * * *."

Consistent with the state's offer of proof, Williams testified that the state crime lab had found low levels of DNA associated with someone other than E on her clothing. Williams

further testified that the crime lab did not conduct further testing of that DNA because there was insufficient material for that purpose.

As noted, in this appeal we focus on whether any error in admitting that testimony was harmless because it had little likelihood of affecting the jury's verdict. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Defendant argues that the victim's credibility was the central issue at trial. Thus, defendant contends that, by allowing the jury to speculate that the foreign DNA belonged to defendant and was—despite the state's previous acknowledgment to the contrary—somehow corroborative of E's testimony, the admission of that testimony was prejudicial to defendant. Defendant reasons that the jury may have relied on that speculative inference as a "tie-breaker" in deciding whether to accept defendant's or the state's theory of the case. The state counters that Williams's testimony regarding the touch DNA was of minimal significance because the state never contended that the DNA evidence in any way implicated defendant. In the state's estimation, even if the jury believed that the DNA found on the victim's clothing was defendant's DNA, that inference would not have prejudiced defendant, because his DNA would likely be present on her clothing merely as a consequence of E spending as much time as she did in defendant's home. In any event, the state contends that the jury was unlikely to have relied on Williams's DNA testimony because the other evidence of defendant's guilt was so strong.

We conclude that any error in admitting Williams's testimony was harmless. Under OEC 103(1), "[e]vidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." In a jury trial, an error is harmless if there is little likelihood that the particular error affected the verdict. *Davis*, 336 Or at 32. That determination "is not a reflection of how we view the weight of the evidence of defendant's guilt, but rather a legal conclusion about the likely effect of the error on the verdict." *State v. Schiller-Munneman*, 359 Or 808, 819, 377 P3d 554 (2016).

In *Davis*, the Supreme Court outlined several factors relevant to our consideration of whether the erroneous admission of evidence is likely to have affected a jury's verdict. Those factors include the nature and context of the alleged error, whether the jury would have regarded the evidence as duplicative or unhelpful in its deliberations, and whether the evidence concerns a central issue in the case. 336 Or at 33-34. We may also consider whether the erroneously admitted evidence was "passed over lightly" or, conversely, was used to support a party's theory. *Schiller-Munneman*, 359 Or at 820-21.

Broadly speaking, the nature of the alleged error is the admission of testimony regarding DNA evidence that was, at most, immaterial. Even though Williams never explained to the jury that E's clothing could bear traces of defendant's DNA due merely to her presence in his home, neither he nor the state ever suggested that the DNA evidence was in any way probative of defendant's guilt. And, because defendant never disputed the state's evidence that he and E had been together in his home, the incidental detection of his DNA on her clothing—if, in fact, the jury concluded that it was defendant's DNA—did not contradict any of his evidence or his theory of the case. Thus, at the outset, it is difficult to see how the admission of that evidence had any tendency to affect the jury's verdict.

As noted, however, defendant's contention is that the DNA evidence implicated a central issue in the case—the victim's credibility. *See State v. Marrington*, 335 Or 555, 566, 73 P3d 911 (2003) (considering whether evidentiary error addressed a central issue in the case). In defendant's view, the jury could have inferred that the crime lab had, in fact, found defendant's DNA, and, without prompting, viewed that speculative inference as relevant to E's credibility. That is, if the jury inferred that the foreign DNA found on E's clothing was defendant's, then it may also have concluded that E's testimony regarding the September 16, 2013, incident was credible. From that conclusion, defendant posits, the jury could have then concluded that E was likely being truthful about the other allegations as well.

We fail to see how the presence of defendant's touch DNA on the clothing that E wore on that date could

enhance her credibility. Defendant did not dispute that he was sitting close to the victim and that she spent time in his home on September 16, 2013. Further, defendant's questioning of Williams on cross-examination emphasized that there was no DNA evidence, including any touch DNA, that linked defendant to the alleged sexual offenses. It is therefore unlikely that the jury speculated that the touch DNA found on E's clothing somehow corroborated her accusations against defendant.

Moreover, in light of the other evidence at trial, we consider it unlikely in any event that the jury would have relied on the DNA evidence to corroborate E's testimony. The jury heard and viewed extensive evidence from which it could assess E's credibility. For example, E's aunt testified that, when she walked in on defendant and E, they quickly separated and appeared nervous. E's mother testified that E went to defendant's home five or six days a week and that defendant spent time alone with her on several occasions. She also testified that E had been taken to the doctor when she was about six years old for urinary infections.

In addition, a forensic interviewer at Kids First,[2] who had interviewed E the week after her disclosure, testified at trial, and a video of that interview was played in full for the jury. E, who was nine years old by the time of trial, also testified and provided detailed descriptions of the alleged offenses that were consistent with the statements that she had made during the interview with Kids First. And even though the Kids First doctor who had examined E acknowledged that she had not observed any physical trauma to corroborate E's testimony, she explained that she would not expect to find physical signs of trauma given the time differential between the alleged sexual offenses and the physical examination. The doctor also testified that E's medical records indicated that she had reported painful urination and bleeding from either her vagina or anus at some time in the past, and she explained that painful urination is often experienced by children who have suffered sexual trauma. She separately explained that urinary infections are not common in children six to eight years of age. Admittedly, Williams's testimony

---

[2] Witnesses at trial described Kids First as a "child abuse assessment center."

regarding the detection of foreign DNA on E's clothing was not exactly "duplicative" of that other corroborative evidence. *See Davis*, 336 Or at 33. In our view, however, the introduction of that other evidence makes it rather likely that the jury "would have regarded the [challenged DNA] evidence as * * * unhelpful in its deliberations." *See id.* at 33.

Finally, Williams's testimony regarding the foreign DNA was very limited and played no role in the state's closing argument. In his own closing, defendant argued no less than six times that "there was no physical evidence," noting specifically that the state had not presented any DNA evidence. The state did not seize on that opportunity to remind the jury that DNA *had* been found on the victim's clothing or to suggest that it might have been defendant's DNA. Instead, the state agreed that there was no DNA evidence linking defendant to E. On that point, the state argued:

> "When we're talking about whether there's DNA evidence, why isn't there DNA evidence? Well, rubbing his jeans up against her shorts, there's no testimony that you would find any kind of DNA evidence there."

In other words, just as it had explained to the trial court, the state argued to the jury that the presence or absence of DNA evidence had no bearing on its case. Thus, the disputed evidence was "passed over lightly" in Williams's testimony, and the state made no use of it to support its theory of the case. *See Schiller-Munneman*, 359 Or at 820-21. For that additional reason, we conclude that there is little likelihood that the jury relied on the speculative inference that defendant's DNA had been found on the victim's clothing in reaching its verdict.

In light of the foregoing, we conclude that, even assuming that the trial court erred in admitting evidence that foreign DNA had been found on the victim's clothing, that error was harmless because there is little likelihood that the DNA evidence affected the jury's verdict. We therefore affirm.

Affirmed.