GARRETT, J.
*265 Defendant appeals a judgment of conviction for murder, ORS 163.115. In his first two assignments of error, defendant challenges the trial court's exclusion of evidence that, according to defendant, was relevant to his theory of self-defense. In his third assignment of error, he challenges the trial court's denial of defendant's motion to suppress statements that defendant made in a police interrogation. As to that issue, we agree with defendant that police impermissibly continued their interrogation after defendant invoked his right to counsel, that the trial court therefore erred in denying the motion to suppress, and that the error was not harmless. That conclusion obviates the need to address defendant's other assignments of error. Accordingly, we reverse and remand.
We review for legal error whether defendant invoked his right to counsel. State v. Sanelle , 287 Or.App. 611, 613, 404 P.3d 992 (2017), rev. den. , 362 Or. 482 (2018). We limit our discussion to the record developed at the pretrial hearing, State v. Pitt , 352 Or. 566, 575, 293 P.3d 1002 (2012), and are bound by the trial court's findings if they are supported by evidence in the record. Sanelle , 287 Or.App. at 613, 404 P.3d 992.
The murder charge arose from the shooting death of the victim at defendant's house. It is undisputed that, after defendant and the victim spent an evening drinking together, defendant shot and killed the victim.
The police interrogation took place at the police station on the night of the shooting, and involved defendant, Officer Hatoor, and Detective Knea. Knea began by reading defendant his Miranda rights. Knea then began asking what he described to defendant *423 as "preliminary" questions, which defendant answered. After approximately five minutes, the following exchange occurred:
"[DEFENDANT]: We moved here in May.
"DETECTIVE KNEA: That was going to be my next question. Okay. Who else is-so there's another male that was at the house. What's his name?
"[DEFENDANT]: (Pause.) What was his name?
*266 "DETECTIVE KNEA: Yeah.
"OFFICER HATOOR: What was his name?
"[DEFENDANT]: I appreciate the hospitality here, fellas, but I think I'm going to get a lawyer .
"DETECTIVE KNEA: Okay. Well, that's obviously something that you have a right to, like I said, okay?
"[DEFENDANT]: His name was [the victim].
"DETECTIVE KNEA: And-and I-I understand that there's probably a little bit of trepidation about talking to me, okay? However, I don't know what happened, dude, at all.
"[DEFENDANT]: Well, [n]either do I.
"DETECTIVE KNEA: And I-okay.
"[DEFENDANT]: So get in fuckin' line. Sorry. Sorry. That was rude. Go ahead.
"DETECTIVE KNEA: I'll give you a little time to sober up, and then we'll talk. But you're going to be here for a little bit, so just make yourself comfortable.
"[DEFENDANT]: No, I know. I know.
"DETECTIVE KNEA: Okay. Yeah. This is not exactly how I wanted this whole thing to go down. I just wanted to get kind of an idea of what happened. And from the get-go you're kinda not being real-
"[DEFENDANT]: Not being real?
"DETECTIVE KNEA: No. You're not being real nice to me, okay? And I don't know you from anybody, dude.
"[DEFENDANT]: All right.
"DETECTIVE KNEA: I live-
"[DEFENDANT]: Well, that's fine.
"DETECTIVE KNEA: Okay. So just chill out.
"[DEFENDANT]: You got-
"DETECTIVE KNEA: You can sober up.
"[DEFENDANT]: I can sober up. I'm sorry. This guy's a nice guy. You're kind of a prick.
*267 "DETECTIVE KNEA: Dude, I just got woken up at 3 o'clock in the morning, okay?
"[DEFENDANT]: So what?
"DETECTIVE KNEA: So what?
"[DEFENDANT]: Yeah. So what?
"DETECTIVE KNEA: I don't know what was going on.
"[DEFENDANT]: That's your fucking job.
"DETECTIVE KNEA: Okay.
"[DEFENDANT]: That's your job.
"DETECTIVE KNEA: Okay. Well, guess what?
"[DEFENDANT]: Guess what?
"DETECTIVE KNEA: I do not-
"[DEFENDANT]: I just fuckin' saw a fuckin' body on my fuckin' floor, blood oozing out in my fuckin' kitchen, so fuck you. You're going to tell me how to wake up?
"DETECTIVE KNEA: I don't think-I don't-
"[DEFENDANT]: You don't know shit-
"DETECTIVE KNEA: I don't think you woke up and just saw him.
"[DEFENDANT]: -about a fucking wake-up."
(Emphasis added.) The interrogation concluded moments later. In total, the videotaped interrogation lasted approximately eight minutes.
Before trial, defendant moved to suppress the portion of the video and transcript following his request for a lawyer, arguing that defendant unequivocally invoked the right to have counsel present during the police interrogation, and that he did not subsequently waive that right by saying, "His name was [the victim]." The trial court struck the evidence *424 of the invocation itself, but otherwise denied defendant's motion.[1] *268 At trial, defendant asserted defenses of voluntary intoxication and self-defense. To support his self-defense theory, defendant testified that the victim had tried to sexually and physically assault him minutes before the shooting.
In refuting defendant's theory of self-defense, the state played the interrogation video during Knea's direct examination, and replayed the final minutes of the video, in which defendant became hostile toward Knea, during closing argument. At closing, the state highlighted the difference between defendant's demeanor in the interrogation video and his more "appropriate" and "articulate" demeanor at trial:
"Now, the defendant, as he appeared in court-and you can take a moment to look at him. Well dressed. He's been appropriate through trial, articulate on the stand, knows the case well, described-you know, self-described anxiety in social situations. A storyteller, a writer, someone who composes, works things through. But you are not looking just at the defendant as he appears before you today.
"We are talking about the defendant on [the date of the shooting]. His conduct on that day, how he behaved, how he acted. And that's really difficult because for the last eight days, that's the [defendant] you've seen; the [defendant] in court. The [defendant] who has an incentive and a motive to present a certain way.
"When you're examining his statements, when you're examining his testimony, and when you evaluate that testimony, you have to take that into consideration.
"[Interrogation video played.]
"It's important to remember that is the [defendant] that [the victim] was with on [the date of the shooting]; a person who can make choices about his behavior, how he acted with who he liked and who he didn't like; a person who said he couldn't remember, but clearly does."
Defendant was convicted of murder.
On appeal, in his third assignment of error, defendant argues that the trial court erred in denying his motion to suppress the portions of the interrogation video and transcript following defendant's statement that he wanted to "get a lawyer." The state disagrees; although the state *269 does not dispute that defendant invoked his right to counsel under the federal and state constitutions, the state argues that defendant then waived that right by immediately proceeding to answer Knea's pending question about the name of the other "male that was at the house."
The right against self-incrimination under Article I, section 12, of the Oregon Constitution includes the derivative right to have counsel present during custodial police interrogations. State v. Scott , 343 Or. 195, 200, 166 P.3d 528 (2007). When a defendant in police custody unequivocally invokes the right to counsel, all police questioning must cease. State v. Meade , 327 Or. 335, 339, 963 P.2d 656 (1998). The state can show that a defendant waived that right, however, by establishing that the defendant, "without prompting from the police, initiated further conversation that evinced a willingness and a desire for a generalized discussion about the investigation." Id. at 341, 963 P.2d 656. See, e.g. , State v. McAnulty , 356 Or. 432, 456, 338 P.3d 653 (2014) (defendant expressed a willingness to continue a discussion about the investigation when she made repeated references to her abuse of her daughter and asked the detectives about their view of the case); Meade , 327 Or. at 337, 341, 963 P.2d 656 (defendant evinced a willingness to have a generalized discussion about the investigation when he "put up his hands as if to stop the detectives from speaking, and said 'You've talked a lot. I want to say a few things' " and discussed his relationship with the victim's mother, the detective's handling of the investigation, and his own innocence).
*425 The state argues that defendant showed a "willingness" to continue the interrogation when, after invoking his right to counsel, and without further prompting, he answered Knea's question about the other "male that was at the house." The state likens this case to State v. Kramyer , 222 Or.App. 193, 194 P.3d 156 (2008), in which the defendant, who was suspected of driving while intoxicated, requested a lawyer but then continued to participate in a field-sobriety test. Id. at 195-96, 194 P.3d 156. We held that the defendant's conduct established a "willingness * * * to continue with the investigation" because he "continued engaging in the conduct that gave rise to the evidence he sought to suppress." Id. at 198, 194 P.3d 156.
*270 We are not persuaded by the comparison of this case to Kramyer . In Kramyer , the defendant's conduct gave rise to the evidence that was the very focus of the investigation. Id. at 198, 194 P.3d 156. The same cannot be said about defendant's conduct here, where he merely answered a single "preliminary" question that he had left unanswered moments earlier.
Knea's response is also inconsistent with an understanding that defendant had thereby demonstrated a willingness "to enter into a generalized discussion of the substance of the charges" or investigation. Meade , 327 Or. at 340, 963 P.2d 656. On the contrary, Knea's immediate response ("I understand that there's probably a little bit of trepidation about talking to me, okay? However, I don't know what happened, dude, at all.") invited (or even pressured) defendant to speak, reflecting an awareness that defendant was reluctant to do so. Knea then continued to make remarks that appear to have been aimed at provoking defendant into talking further. In short, we reject the state's argument that defendant waived his right to counsel by reinitiating a discussion with police. See Meade , 327 Or. at 340, 963 P.2d 656. Cf. State v. Barmon , 67 Or.App. 369, 377, 679 P.2d 888, rev. den. , 297 Or. 227, 683 P.2d 91 (1984) (defendant did not express a desire for a generalized discussion when he asked, "Do I have a right to know what I'm being charged with?" and then, when the officer explained that the charges were rape, sodomy, and burglary, exclaimed, "I didn't steal anything"); State ex rel Juv. Dept. v. Thai/Schmolling , 138 Or.App. 354, 359, 908 P.2d 844 (1995) (juvenile defendant did not reinitiate a conversation with police when he said that the allegations against him "were not true and that only his brother Michael * * * did that," because the "child's meager attempt to exculpate himself" could not be considered "sufficient evidence of a 'willingness and desire for a generalized discussion' ").
Accordingly, police questioning should have stopped after defendant invoked his right to counsel. Meade , 327 Or. at 339, 963 P.2d 656. Knea's comment constituted improper additional interrogation because police should have known that comment was " 'reasonably likely to elicit an incriminating response.' " Scott , 343 Or. at 203, 166 P.3d 528 (quoting *271 Rhode Island v. Innis , 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 1980) ). Therefore, the trial court erred in denying defendant's motion to suppress.
We next must determine whether the error was harmless. An error is harmless if there is "little likelihood that the error affected the verdict." State v. Davis , 336 Or. 19, 32, 77 P.3d 1111 (2003). In making that determination, we assess "any differences between the quality of the erroneously admitted evidence and other evidence admitted on the same issue." State v. Maiden , 222 Or.App. 9, 13, 191 P.3d 803 (2008), rev. den. , 345 Or. 618, 201 P.3d 909 (2009) ; see also Davis , 336 Or. at 33-34, 77 P.3d 1111 (focusing on whether the fact finder would have regarded the evidence as duplicative, cumulative, or unhelpful in its deliberations). We also consider the importance of the erroneously admitted evidence to a party's theory of the case. Maiden , 222 Or.App. at 13, 191 P.3d 803. We decide whether the erroneous admission of disputed evidence was harmless by reviewing all pertinent portions of the record. State v. Flores , 284 Or.App. 754, 755, 395 P.3d 73, rev. den. , 361 Or. 645, 398 P.3d 46 (2017).
In arguing that any error was harmless, the state points out that it "relied on the recording not for the substance of defendant's statements, but instead to show that *426 his demeanor upon arrest was different from his demeanor during trial[.]"
But that use of the video was nonetheless important. This case turned on whether the jury believed defendant's theory of self-defense. Accordingly, evidence bearing on the jury's assessment of defendant was important. See Maiden , 222 Or.App. at 13, 191 P.3d 803 (considering the importance of the erroneously admitted evidence to a party's theory of the case). Moreover, the video was the state's only evidence of defendant becoming defensive and hostile toward police upon mention of the victim. See Davis , 336 Or. at 33-34, 77 P.3d 1111 (erroneously admitted evidence is less likely to be harmless if it is not duplicative or cumulative of other evidence admitted on the same issue).
For those reasons, we cannot conclude that there was "little likelihood that the error affected the verdict." Davis , 336 Or. at 32, 77 P.3d 1111.
Reversed and remanded.

The trial court did not specify whether defendant's invocation was equivocal or unequivocal. That issue is not contested on appeal.