HADLOCK, J.
*487 *555 After an evening that involved heavy drinking and arguments, defendant shot her husband, J, in the leg. All four of defendant's children were present. A jury convicted defendant of first-degree assault and four counts of reckless endangerment, and she appeals, raising three assignments of error. Defendant first challenges the trial court's denial of her motion to suppress statements that she made in response to questions that police officers asked before they read her Miranda warnings. Second, defendant makes unpreserved challenges to what she characterizes as comment on her "invocation of her rights to counsel, and on her exercise of her rights to remain silent." Third, defendant challenges the trial court's exclusion of expert testimony that she offered in support of her self-defense theory; the excluded evidence related to a "danger assessment" regarding the threat that J may have posed to defendant before she shot him.
For the reasons set forth below, we reject defendant's first assignment of error on the grounds that admission of her un-Mirandized statements did not violate the Fifth Amendment to the United States Constitution and that, even if the trial court erred in admitting those statements because they were obtained in violation of defendant's rights under Article I, section 12, of the Oregon Constitution, any such error was harmless. We reject without further discussion the unpreserved arguments that defendant makes in association with her second assignment of error, including her suggestion that we should overlook certain evidence admitted without objection when we conduct our harmless-error analysis on the first assignment of error. Finally, we conclude that the trial court did not err in excluding defendant's "danger assessment" evidence. Accordingly, we affirm.
I. THE TRIAL
In considering whether a trial court erred in denying a motion to suppress, we review the ruling for legal error.
*556 State v. Krause , 281 Or. App. 143, 145, 383 P.3d 307 (2016), rev. den. , 360 Or. 752 (2017). In conducting that review, we ordinarily would be bound by the trial court's implicit and explicit factual findings so long as the record supported them, id ., and therefore would describe the evidence in the light favoring the court's ruling. Here, however, we ultimately conclude that any Article I, section 12, error associated with denial of defendant's suppression motion was harmless. A harmless error analysis is based on reviewing "all pertinent portions of the record" to determine "if there is little likelihood that [any] error affected the verdict." State v. Wirkkala , 290 Or. App. 263, 271, 414 P.3d 421 (2018) (internal quotation marks omitted); see State v. Simon , 294 Or. App. 840, 849, 433 P.3d 385 (2018) (similar). We therefore describe the evidence in accordance with that standard.
A. Evidence Not Challenged on Appeal
We begin by reviewing the pertinent evidence that was introduced at trial, not including the evidence that was the subject of defendant's suppression motion, which we describe later in the opinion. Because the trial spanned five days and the transcript is lengthy, our description of the relevant facts necessarily summarizes and characterizes certain evidence instead of setting it out in detail.
At trial, there was no dispute that defendant shot J in the leg after they argued and that the shooting occurred in the couple's home, where four children, ages 13, 12, 8, and just under 2, were present. The three older children are defendant's from a previous marriage; J is the father of the youngest child. The state's theory, as described in its *488 opening statement, was that defendant intentionally shot J in the leg in anger following an argument, and that she also fired other shots inside the house. The shot that struck J shattered his femur, requiring surgery. Defendant's theory was that she acted in self-defense, shooting J only after he physically attacked her and one of the children.
J was the state's first witness at trial. He described a party at the couple's house that involved heavy drinking and that, after their guests left, led to him and defendant arguing-a type of circumstance that often resulted in him *557 packing up and leaving the house.[1] J testified that, on this occasion, he told defendant that he was going to take his child and leave. J could not find his keys, however, and he thought that defendant had taken them. J and defendant continued arguing; J acknowledged that he was angry and that he called defendant names.
J testified that, as he looked through desk drawers for his keys, defendant told him that "she should have shot [him] a long time ago in the foot like she always said she was going to do" if he left her or cheated on her. Defendant said to J, "you think I won't shoot you," he responded that defendant would not shoot anybody, and they went back and forth that way several times. J testified that defendant then shot him and he fell, saying "bitch you shot me." Defendant responded, "you're god damn right" and asserted that she should have done it a long time ago. Yelling continued, and according to J, defendant then fired three additional shots.
Sometime after defendant shot him, J asked defendant to call an ambulance, but she did not. Instead, defendant pulled J's pants off, got peroxide, and called her mother (who is a nurse) to seek advice. Defendant went upstairs at one point and J reached a cell phone and dialed 9-1-1. Defendant came back down the stairs and, J testified, he threw the phone (which ended up connecting with 9-1-1) somewhere around the chair or the couch. Later, J heard defendant speaking to a 9-1-1 operator on another telephone, but he did not yell because he saw lights outside indicating that police officers had already arrived. Defendant put the gun on the desk. Police officers called over a loudspeaker for everybody to come outside, and officers eventually entered the house.
At trial, J denied that he had ever hit or head-butted defendant. He denied having thrown defendant to *558 the ground on the night she shot him; he also denied ever having thrown any of the children to the ground.
The jury heard a recording of the "open line" call to 9-1-1 that J initiated shortly after he was shot, when he placed the call and then threw the phone by a couch or chair (before officers were dispatched):
"DISPATCHER: 911 emergency.
"[J]: How the fuck am I going to take my pants off? And you fucking shot me in the leg.
"DISPATCHER: Hello?
"* * * * *
"THE DEFENDANT: I shot you. Turn over on your back.
"[J]: I'm fucking trying.
"DISPATCHER: What's the address there?
"[J]: Ow! Stop please. * * * You fucking shot me.
"THE DEFENDANT: Damn right I fucking shot you for good reason too.
"* * * * *
"THE DEFENDANT: (Indiscernable) call any cops. I am not going to fucking go to jail. (Indiscernable). Fuck that.
"[J]: Well why'd you shoot me then?
"THE DEFENDANT: Because you deserve it. Now roll the fuck over. (Indiscernable).
"[J]: I'm trying."
The recording continues with defendant encouraging J to roll over and remove his pants and J exclaiming in pain. Defendant then says more about why she shot J:
*489 "THE DEFENDANT: (Indiscernable). I would have shot you in the foot (indiscernable).
"[J]: Ow!
"THE DEFENDANT: I fucking love you. It's a crazy love (indiscernable).
"[J]: Ow!
"THE DEFENDANT: If I didn't love you, I wouldn't have done it."
*559 The 9-1-1 dispatcher was able to connect that "open line" call with an address for defendant and called another associated telephone number, apparently without getting an answer. However, about 20 minutes after the open-line call had come in, defendant called back to dispatch. The dispatcher asked defendant what was going on at the house and defendant responded, "Nothing that I'm aware of." The dispatcher told defendant that 9-1-1 had received a call from another of the phones associated with that address, and defendant suggested that her baby might have hit the emergency-call dial on that phone.[2] At that point, police arrived.
Trooper McClendon is one of the officers who responded. McClendon asked dispatch to tell defendant to come out of the house with her hands up and nothing in them. Defendant complied with that request, she was handcuffed "based on the information that [officers had] that somebody was possibly shot inside the home," searched, and put in the back of McClendon's car. McClendon then questioned defendant about the shooting and the weapon, who remained in the house, and why J was not coming out of the house in response to police commands. Defendant's answers to those questions-described later in this opinion-were the subject of her suppression motion.
McClendon could see the children walking around inside the home. He asked one of the older children if he could get his siblings to come outside, and all four of the children came out to the police cars. One child said that J had been shot in the leg and was still inside. The officers entered the home, cleared it, and-"once again not having any information on * * * what exactly went on"-handcuffed J and searched his waistline for weapons. Medics arrived and transported J to a hospital.
Oregon State Police Detective Harris Powers arrived on the scene after defendant had been seated in the back of McClendon's patrol car. Harris Powers introduced herself to defendant and read her Miranda rights. The detective asked defendant "what would be important *560 for [the detective] to know about what was inside the house" and also asked defendant if they "could do a walk through together, so that [defendant] could point out * * * what would be important * * *." During the subsequent "walk through," defendant told Harris Powers that a woman had raped her that evening and had left the house not long before the shooting. Defendant requested a rape kit.
During her conversation with Harris Powers, defendant initially did not talk about the shooting. However, after Harris Powers asked about an item that had been knocked over, defendant said that J "got violent" that evening. Harris Powers then told defendant that, "[r]ight now," all she was "seeing" was "a gun, shots being fired"; Harris Powers said that if there was "more to the story than that," it would be very important for Harris Powers to know. The detective also noted that if defendant was "a victim of something," "that would be really important for [Harris Powers] to know." Defendant told Harris Powers that she wanted to "give [her] the facts" but did not "feel comfortable" because she was "not sure."
Defendant was eventually taken to a hospital, where Harris Powers continued to interview her. Defendant told the detective that the woman who sexually assaulted her had held her down by the chest; however, defendant said that she did not have any injuries and Harris Powers did not observe any. Harris Powers offered to have defendant taken to Medford for an examination because no sexual-assault nurse was available at the local hospital; defendant appears to have declined. Harris Powers then explained that *490 defendant would be taken to jail on assault and reckless-endangerment charges. At no point during their interaction did defendant say that J had hit her, thrown her to the ground, or assaulted the children.
Oregon State Police Detective Scott interviewed J at the hospital. Scott had heard that defendant was accusing J of having been physically abusive to her, so he questioned J on that topic. J gave Scott a description of the shooting that largely aligned with J's later trial testimony. J denied having pushed or threatened defendant on the night of the shooting; he also asserted that he had "never ever put [his] hands on that woman."
*561 Detective Harris Powers, whose case load largely involves crimes against children, conducted forensic interviews of the three older children the day after the shooting. B, the oldest child, talked with Harris Powers about the family and alcohol-exacerbated arguments between defendant and J. When asked to describe everything he remembered about the previous evening, B said that, after the guests left, defendant and J argued downstairs while B told the other children to stay upstairs. B thought the children needed to defend themselves against J "because he's the physical one"; however, B could tell that defendant "has the gun and he [J] doesn't." B and some of the other children went downstairs at one point and B saw that defendant had a gun: "She was-she got-went out, got the gun, [cocked] it, and she was-she didn't really want to shoot him because she was still defending in her own mind," but then defendant shot J in the leg. B said that a verbal argument led up to the shooting, but nothing physical was going on. B told Harris Powers that defendant had shot J because it was the only way to make him stop taunting or irritating her. B repeatedly said that he had never seen defendant and J in a physical fight and that J had never done anything physical to defendant.
Harris Powers also interviewed 12-year-old G, who said that defendant shot J following an argument. G was in the room when that happened. Harris Powers asked if "anything physical" had been going on; when G asked for clarification, she asked whether defendant was hitting J or J was hitting defendant. G thought he had heard J threatening defendant; when asked whether he had seen that or heard that, G said that, after defendant cocked the gun, J said "shoot me, shoot me" and "once he kept on saying it, she did." G told Harris Powers that defendant and J had "a big fist fight" at one point in the past. However, G also said that he had not seen J hit defendant, and G asserted that "he would never hurt her." G thinks that he has seen defendant slap J in the face; that may be the incident he described as a fist fight. At the end of the interview, Harris Powers again asked G whether he had ever seen J hit defendant. G answered "No" and responded affirmatively when the detective asked, "you're pretty confident about that?" G said that he knows that J "would never do it."
*562 Finally, Harris Powers interviewed eight-year-old L, who remembered that defendant had shot J in the leg. Before that happened, L said, J "was going ha, ha, and said shoot me." L said that defendant "had to shoot him just to show that she wasn't scared." L described G having yelled at defendant to stop and not shoot J, as well as defendant telling G to shut up. L did not see defendant hit J or J hit defendant. However, they were arguing and J was "shoving [his] face into [defendant's] face" while defendant backed up, and she characterized J as having been "bullying" defendant. L said that she had seen J and defendant yell and argue in the past but had not seen them hit each other.
B, G, and L also testified at trial. In some ways, their descriptions of events were similar to the statements they made the day after the shooting. However, each child also testified that J was physically aggressive toward defendant before the shooting. G testified that, while looking for his keys, J "got really angry, and started getting aggressive with [defendant], pushing her, head-butting her," and so G got between them and told J to stop. J then "threw [G] against the wall" and started saying something like "shoot me, shoot me." Defendant cocked the gun, fired warning shots, and then shot J in the leg when he did not stop walking toward her. B testified that defendant and J were "tussling" before the shooting and that J was attacking *491 defendant. B also described J throwing G down. B testified defendant then grabbed a gun, fired warning shots, and finally shot J in the leg when he "would not stop." L testified that J head-butted defendant "a bunch of times" and, when G tried to stop him, J threw G down; it was after that that defendant got mad and shot J. None of the children suggested that J had possessed or threatened use of a gun during the incident.
Defendant testified on her own behalf. She described the night in question, including the party that had occurred. At some point in the evening, J had shown off some guns to some of their guests; that was something that J did often and defendant "didn't think anything of it." The guns included defendant's handgun, which she kept on a gun rack, and some rifles. As the evening went on, the situation became "chaotic," with "everyone * * * getting more drunk and more drunk" and defendant and J arguing. Defendant testified *563 that J became so angry that he repeatedly head-butted her. Every time that J head-butted defendant, her head flipped back and she walked backward away from him. J then grabbed her by the neck and threw her to the ground. At that point, G got between them and told J to stop; defendant then saw G "fly through the air." Defendant "backed up to the gun rack," grabbed her gun, cocked it, and told J that he needed to leave. J advanced on defendant, saying that she would not shoot, so she started firing warning shots. J then started running toward defendant, so she shot him in the leg. Defendant testified that there is "no doubt" in her mind that, if she had not shot J, "he would have gotten the gun and he would have killed [her]."
Defendant testified that she had had a few physical altercations with J in the past, where they would do what J "called play fighting" that involved throwing defendant around, making her fall, or slamming her on the ground. J had once threatened to kill defendant (as well as other people) after arguments over claimed infidelities. On another occasion, J became so angry with defendant that he head-butted the wall, making huge holes in the sheet rock, and punched the recliner in which defendant was sitting. Defendant also observed significant injuries to another woman who was visiting their home; she believed that J had assaulted that person. Defendant tried to keep the children from seeing those physical altercations: "times when [she] knew the drinking was going to be bad, and [J] was not going to be very nice," defendant would leave her children at their grandmother's house, "to keep them out of it as much as possible."
On cross-examination, defendant acknowledged that J had not held a gun that night except when he was showing guns to his friends earlier in the evening, and that J had not threatened her with a gun during the argument: "he never grabbed the gun towards me that night, no."
To support her self-defense theory, defendant offered the testimony of Daniel Sheridan, who has a doctoral degree in nursing, specializes in forensics, and has expertise in topics related to domestic violence. Sheridan met with defendant, reviewed photographs of her that had been taken the *564 night of the shooting, and testified about bruises and other marks that he saw in the photographs. Sheridan opined that one bruise on defendant's neck was "consistent with a pattern fingertip like contusion" and that some bruises to one of defendant's arms were "consistent with being grabbed with force." Marks on the other arm were consistent with bruises that would result from warding off blows. Sheridan believed that the bruises on defendant's arms appeared to be "numerous days old" and had not occurred within 48 hours of the pictures being taken. Sheridan testified generally that the bruises were "consistent with the history" that defendant had given to him when he interviewed her before trial.[3] *492 Sheridan also testified about typical patterns in some relationships involving domestic violence, including that-in many such relationships-"domestic violence does tend to increase in severity and in frequency, which then places the woman in increased risk of-of harm and-and even of increased risk of death." Sheridan testified in some detail about certain risk factors associated with increased domestic violence, including unemployment, having children in the household that are not the abuser's children, and abuse of alcohol or other drugs. Sheridan also testified that it is not easy for an abused spouse to leave and that families may sometimes not be supportive. It is "pretty much the norm" for victims to hide that they are being abused.[4]
Defendant also offered testimony from other witnesses (including her mother, McIntosh), who testified about past incidents in which they observed bruises that looked *565 like handprints or fingerprints on defendant's body, heard J angrily threaten other peoples' lives in a way that made them scared for their safety, or saw J throw defendant off of a porch.
In rebuttal, the state played a video recording of Detective Harris Powers's interview of McIntosh about the call that defendant had made to her shortly after she shot J. During that interview, McIntosh said that defendant had sounded frustrated, irritated, and mad. Defendant told McIntosh that she had shot J, saying "I'm tired of it mom." Defendant "said I told him he needs to get a job, quit draining my family, quit taking down my family" and quit asking defendant for other things. "She goes well, you know, I told him I've had enough. He just needs to go. * * * [She] said I didn't try and kill him or anything. I just wanted him out of here. So she said she shot him in the leg."
During her conversation with defendant, McIntosh could hear J in the background saying things like "oh she shot me" and defendant saying "you need a job," "to support your family," and to "up and be a man" and "that's all [defendant] kept saying" the entire time she was on the phone with McIntosh. McIntosh also said that, at some point, defendant had told her that she had gotten bruised when she and J argued "and he tried to restrain her."
B. Evidence of Defendant's Statements Admitted Over Her Objection
Before trial, defendant moved to suppress "any and all incriminating statements" that she made "as a result of questioning without first informing her of her Miranda rights." Defendant made the responsive statements at issue-which we set out in detail below-after being ordered out of the house at gunpoint. The statements were captured on a recording made by a camera in McClendon's car. The state acknowledged that defendant was in custody when she made the statements in response to officers' questions and that she and had not yet been read Miranda warnings. Nonetheless, the state argued, the officers' questions were permissible because they were necessary to the officers' ability to safely secure the scene. That is, the state argued that the questions asked did not constitute "interrogation" that *566 triggered the Miranda requirement. Defendant disagreed, arguing that the questions constituted interrogation because they asked defendant about the crime with which she eventually was charged.
The court denied the suppression motion, ruling that Miranda warnings were not required, even though defendant was in custody, because the officers were questioning defendant "to resolve the security and safety issues that were raised in the immediate time period at the scene" and not "for interrogation purposes." In accordance with that ruling, the videotape from McClendon's car was played for the jury; it included the following exchange between defendant, McClendon, and other officers, which occurred after defendant *493 had been called out of the house at gunpoint:
"TROOPER McCLENDON: * * * hey [defendant], relax. Is there somebody here that's shot or not?
"THE DEFENDANT: Not that I'm aware of.
"* * * * *
"TROOPER McCLENDON: Husband, where's he at?
"THE DEFENDANT: In the living room.
"TROOPER McCLENDON: Okay.
"SECOND TROOPER: (Indiscernable) 911 call, somebody saying you shot me, somebody else saying yes I did, okay so is there somebody shot in there or not?
"THE DEFENDANT: Not that I'm aware of.
"* * * * *
"TROOPER McCLENDON: * * * Hey [defendant], is the only other adult inside, your husband?
"THE DEFENDANT: Yes.
"TROOPER McCLENDON: Is-is he going to be able to walk out here?
"THE DEFENDANT: He should."
The troopers then hailed J, asking him to come out of the house with his hands up, but he did not. Defendant told McClendon that she had four children in the house, which McClendon acknowledged before asking why J was not *567 coming out. Defendant responded that she did not know. The exchange continued:
"TROOPER McCLENDON: Well it's either he comes out here and we keep guns on him here, or we go inside the house with guns on all those kids. So why isn't he coming out? You need to start being real honest right now.
"THE DEFENDANT: Okay, because he's an ex-felon.
"TROOPER McCLENDON: Okay, and-?
"THE DEFENDANT: He's scared of police.
"TROOPER McCLENDON: And he maybe has a gunshot wound in his leg?
"THE DEFENDANT: (No audible response).
"TROOPER McCLENDON: That's what I thought."
Defendant asked if she could talk to J and McClendon said that she could not, but could help by "being honest with [him], and start telling what's going on." The exchange continued:
"THE DEFENDANT: What do you want me to tell you? What do you want-?
"TROOPER McCLENDON: Is he able to walk out here?
"THE DEFENDANT: Probably not."
McClendon then asked defendant for her oldest child's name, and McClendon then spoke to that child and asked him to gather his siblings and come outside the house, which the children did. Officers spoke to the children, who confirmed that J was in the living room and could not move. A child told police that a gun was on a desk in the house. McClendon then questioned defendant about the gun:
"TROOPER McCLENDON: * * * Where's the gun at [defendant]? Where'd you put the gun?
"THE DEFENDANT: My gun that I own is on my desk.
"TROOPER McCLENDON: On your desk?
"THE DEFENDANT: In the living room.
*568 "TROOPER McCLENDON: In the living room, okay.
"THE DEFENDANT: On top of it.
"TROOPER McCLENDON: Is that where [J] is?
"THE DEFENDANT: [J] should be in the living room.
"TROOPER McCLENDON: Okay, thank you. Did he have a gun on him at all tonight?
"THE DEFENDANT: Not tonight."
Officers then approached the house, repeatedly telling J to get his hands up; after reaching the house, they rolled J over and handcuffed him.
*494 C. Closing Arguments and the Verdict
In addition to explaining how the evidence supported each element of the charged crimes, the state's closing argument focused on defeating defendant's self-defense claim. The prosecutor emphasized that defendant did not call 9-1-1 for assistance after she shot J, that she complained about J's unemployment when she called her mother after the shooting, and that the open-line 9-1-1 call reflects "no empathy" for J's pain, but only callousness, anger, and frustration. The prosecutor observed that defendant had "never claimed self-defense" when she spoke to the 9-1-1 operator or when she spoke to officers who responded to the shooting. The prosecutor also argued generally that the evidence, including forensic evidence and the children's initial statements to Harris Powers, was inconsistent with defendant's self-defense theory.
As the prosecutor anticipated, defendant's closing argument focused on her self-defense claim, based partly on the testimony of the children and other witnesses who reported knowing of J's past threats and aggression. Defendant relied heavily on Sheridan's testimony, both directly and implicitly, in making her self-defense argument, referring to the shame that domestic-violence victims often feel (to explain why she did not tell responding officers that J had attacked her), to the danger associated with verbal threats of the sort that she testified that J had made, to defendant's testimony about the "past history of abuse" that often escalates, and to the bruising that both Sheridan *569 and defendant's mother described. Defendant asserted that "their past history plays into it being reasonable for her to react how she did"-the "history of being physically abused by him, having been threatened to [be] kill[ed] by him, just that plays into how reasonable it is and for her in that situation to know that she could get-so that past history is 100 percent relevant to what was going on in that situation, as to her frame of mind, and how reasonable it was for her to react as she did."
The jury found defendant guilty of all charges.
II. ANALYSIS
A. Admission of Defendant's un- Mirandized Statements
In her first assignment of error, defendant contends that the trial court erred when it denied her motion to suppress the statements that she made after officers called her out of the house at gunpoint, before they read her Miranda warnings. Defendant contends that officers violated her rights under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution by interrogating her while she was in custody without having first Mirandized her. She contends that the questions officers asked were reasonably likely to elicit incriminating responses and, therefore, constituted interrogation. Defendant acknowledges that the United States Supreme Court has recognized a "public safety" exception to the Miranda requirement when there is a "need for answers to questions in a situation posing a threat to the public safety." New York v. Quarles , 467 U.S. 649, 657, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). Defendant asserts that no analogous exception applies under the Oregon Constitution and that, in any event, the officers' questioning here does not fall within any public-safety exception because not all of the questions were related to safety (like asking defendant her husband's name) and the officers continued to ask questions after defendant left the house and they learned that the gun was on the desk inside. At that point, defendant asserts, "the public-safety concern had ended."
In response, the state urges us to hold that a "public safety" exception to the Miranda requirement applies under *570 Article I, section 12, as it does under the Fifth Amendment. Cf. State v. Pender , 181 Or. App. 559, 563-64, 47 P.3d 63 (2002) (leaving that question open). The state contends that such an exception applies here because the officers knew that someone had been shot inside the house and that there was a "loose gun." Accordingly, the state concludes, the officers permissibly questioned defendant in "an urgent attempt to get information that would allow police to secure the scene." In any event, the state asserts, any error associated *495 with admitting the statements was harmless because the statements were insignificant and cumulative of other evidence in the record, including other statements by defendant.
Preliminarily, we reject without extended discussion defendant's argument that the questions the officers asked as they called defendant out of the house do not fall within the Quarles public-safety exception for Fifth Amendment purposes. As in Quarles , the on-scene officers had an immediate need to determine the location of a gun associated with a violent crime that had just occurred; they also had an immediate need to determine who was in the house and whether those individuals or defendant presented any threat. Under Quarles , the questions were justified because they were "necessary to secure [the officers'] own safety or the safety of the public" and were not "questions designed solely to elicit testimonial evidence from a suspect." 467 U.S. at 659, 104 S.Ct. 2626.
We turn to defendant's argument that the officers' questions violated her rights under Article I, section 12. We do not reach the merits of that argument. Our review of the record leads us to agree with the state that, for the reasons set out below, there is little likelihood that the jury's verdict was influenced by admission of the statements that defendant made after she emerged from the house, before she received Miranda warnings. In other words, we conclude that any error associated with admission of those statements was harmless. Accordingly, we need not decide whether a public-safety exception exists to the Article I, section 12, prohibition against subjecting individuals to custodial interrogation in the absence of Miranda warnings.
It is defendant's burden, as the party seeking reversal based on a claim of evidentiary error, "to show some *571 likelihood that the challenged evidence affected the verdict." Simon , 294 Or. App. at 849, 433 P.3d 385.
"In assessing whether erroneously admitted or excluded evidence affected the verdict, we consider the nature of the evidence in the context of the trial as a whole. * * * Among other factors, we consider whether the evidence was cumulative of other evidence admitted without objection, which includes assessing any differences in the quality of the erroneously admitted or excluded evidence as compared to the other evidence on the same issue. * * * We also consider how the case was tried and the extent to which the disputed evidence was or was not emphasized by the parties and central to their theories of the case."
Id . (citations omitted).
Defendant accurately observes that, as the parties' closing arguments suggested, the outcome of the trial turned on whether the jury was persuaded that she had not acted in self-defense. She contends that her self-defense theory was undermined by admission of three of her un-Mirandized statements. First, defendant points to her response, "Not tonight," when McClendon asked whether J "ha[d] a gun on him at all tonight." Defendant contends that that response undermined her self-defense claim because it could have led the jury to believe that she was not justified in using force to protect herself from J. Next, defendant points to the two times she responded negatively-"Not that I'm aware of"-when asked whether anybody inside the house had been shot. Defendant contends that those statements, too, weakened her self-defense claim.
Considering the entirety of the record, we conclude that there is little likelihood that the jury's verdict was affected by the un-Mirandized statements admitted over defendant's objection. The first statement at issue is defendant's acknowledgement that J did not have a gun on him "tonight." That statement added nothing to evidence already in the record. Defendant never claimed, in her trial testimony or otherwise, that J had used or threatened her with a gun on the evening in question. To the contrary, she acknowledged on cross-examination that J had not "grabbed a gun" towards her and that the only time that defendant *572 had held a gun that night was earlier in the evening, when he was showing the family's firearms to his friends, as he often did. Nor did the children, either in their statements to Harris Powers or in their trial testimony, suggest that J had threatened defendant with a gun. Accordingly, *496 there is little likelihood that the jury's verdict was affected by her acknowledgement that J did not have a gun on him that evening.
In the context of the other evidence admitted at trial, it also is unlikely that the verdict was influenced by defendant's repeated statement to responding officers that she was not aware that anybody in the house had been shot. First, the content of those statements does not differ meaningfully from evidence of other statements that defendant made that were admitted without objection. When the 9-1-1 operator reached defendant by telephone and asked what was going on at the house, defendant responded, "Nothing that I'm aware of"-using words substantively identical to those she later used in her un-Mirandized statements to officers. Defendant also told the 9-1-1 operator that the emergency call from the house might have been the result of her baby hitting an emergency-dial button on a telephone. Thus, evidence that defendant told officers that she was "not aware" that anybody had been shot was cumulative of other evidence that defendant had tried to deny the shooting.
Moreover, to the extent that defendant's statements to the responding police officers might be viewed as uncaring, other evidence in the record made that point more powerfully. That evidence includes defendant's recorded statement to J that she shot him because he "deserved it." It also includes defendant's statements to McIntosh-made after defendant had shot J and before officers arrived at the house-suggesting that she shot J out of anger or frustration because he was unemployed and a drain on the family. As McIntosh described it to a detective in a video-recorded statement:
"She goes well, you know, I told him I've had enough. He just needs to go. * * * She said I didn't try and kill him or anything. I just wanted him out of here. So she said she shot him in the leg."
*573 Given that other evidence of defendant's state of mind on the night of the shooting, evidence that she twice told responding police officers that she was not aware that anybody in the house had been shot is cumulative at most. There is little likelihood that those statements influenced the verdict. Accordingly, defendant's contention that the trial court erred by admitting the statements presents no basis for reversal.
B. Exclusion of the Danger-Assessment Evidence
We turn to defendant's third assignment of error, in which defendant argues that the trial court erred "when it excluded expert testimony regarding evidence of defendant's score on a domestic-violence danger assessment." The argument relates to Sheridan, defendant's expert witness, whom the court permitted to testify about the injuries he saw in photographs of defendant and about general patterns in domestic-violence cases. Defendant's argument on appeal relates to additional evidence that she proffered; she wished to question Sheridan about a "dangerousness assessment" that he had performed to determine how much danger J posed to defendant, as reflected in a numerical score. The state objected to the dangerousness-assessment evidence as irrelevant because the score was not something that defendant had known of at the time she shot J. Defendant countered that the assessment evidence was relevant because it was based on defendant's report of "things that have happened to her in her past" and, therefore, the "reasonableness of her defending herself and her state of mind."
In an effort to determine which part of Sheridan's testimony it would admit and which it would not, the court asked defendant to put Sheridan on the stand outside the jury's presence to make an offer of proof. In that offer, Sheridan testified that a "danger assessment" is a tool that police departments use to determine how likely a person is "to be killed in a domestic violence relationship if she stays in that relationship without some sort of intervention." The assessment is based on asking certain "weighted questions" of the potential victim. As pertinent to this case, Sheridan assessed the danger that J posed to defendant by having defendant answer 20 questions, including on such matters as whether "physical violence increased in severity *574 or frequency over the past year," whether J owned a gun, whether he was *497 unemployed, whether he was controlling or jealous, whether he had ever threatened defendant with a weapon, and whether he had ever threatened to kill her. Sheridan explained that the questions reflect behaviors that have been precursors to domestic violence, including homicides. Based on defendant's answers to the questions, Sheridan gave defendant a score of about 23, which "falls into a category called extreme danger, which is the highest category."
After hearing the offer of proof, the state again objected to the evidence, arguing that the assessment score was irrelevant because defendant had not known of it when she shot defendant. The trial court agreed with the state that an "opinion about the risk of * * * future domestic violence really is not relevant." Accordingly, it ruled that "this particular assessment and the results of that assessment would not be admissible." As noted, the trial court ruled differently with respect to general "aspects of domestic violence" and permitted Sheridan "to testify about general characteristics of a person who has been abused," but "without specific reference to [defendant]." The court said, for example, that defendant could ask Sheridan about a situation when "x y and z occurred" and whether that situation is "consistent or inconsistent with a domestic violence scenario." The court explained its ruling to Sheridan as follows:
"[T]he information, the questions about the danger assessment with regard to [defendant] would not be admissible, and so [defense counsel] won't be asking questions about those.
"What she is entitled to ask you * * * are not questions specific to [defendant]. She is entitled to establish that you're an expert in the area of domestic violence, and ask you questions about characteristics or scenarios that are consistent with domestic violence, or inconsistent, because that could help our jury understand more about the subject of domestic violence[.]"
On appeal, defendant argues that she should have been able to introduce evidence of the danger-assessment score of 23 because that score indicated that her fear of J was reasonable, as was her belief that she needed to defend *575 herself from him. Defendant relies in part on OEC 404-1(1), arguing that the danger-assessment score was admissible under that rule because it would assist the jury in understanding the significance of the history of domestic violence that defendant claimed existed in her relationship with J. Defendant contends that the score "placed those incidents into a framework" showing that J's behavior on the night of the shooting led defendant to reasonably believe that he was threatening the imminent use of physical force against her. The state contends that the trial court correctly excluded the assessment-score evidence because it was information about J of which defendant had been unaware at the time of the shooting. For the reasons that follow, we agree with the state.
Defendant's argument fails in light of the principle "that, in general, a person's right to use force in self-defense depends on the person's own reasonable belief in the necessity for such action." State v. Oliphant , 347 Or. 175, 191, 218 P.3d 1281 (2009) (citing State v. Holbrook , 98 Or. 43, 70, 188 P. 947 (1920) (emphasis in original)).[5] That is, the circumstances "must be considered from the standpoint of a reasonable man in the plight of the defendants." Holbrook , 98 Or. at 70, 188 P. 947. What matters is what a person claiming self-defense believed at the time-and what "a reasonable person in his position would have believed"-regarding the need to defend against the imminent use of force. Oliphant , 347 Or. at 194, 218 P.3d 1281.
That focus on what the defendant believed-and what a reasonable person in his or her situation would have believed-has led us to hold that only information known to the defendant is relevant in assessing the reasonableness of the defendant's belief in the need for self-defense. See, e.g. , *498 State v. Easley , 290 Or. App. 506, 517, 415 P.3d 1099, rev. den. , 363 Or. 390, 434 P.3d 31, cert. den. , --- U.S. ----, 139 S. Ct. 574, 202 L.Ed.2d 409 (2018) (in murder case in which the defendant raised a self-defense claim, the trial court did not err when it excluded evidence of the victim's previous aggressive act toward another person, when *576 the defendant had not been aware of that act when he killed the victim); State v. Ryel , 182 Or. App. 423, 431, 435, 51 P.3d 8 (2002), rev. den. , 335 Or. 255, 66 P.3d 1025 (2003) (evidence of manslaughter victims' violent reputations was not relevant to the defendant's self-defense claim "because defendant was unaware of their reputation when he shot them," despite argument that the evidence would have helped "establish the reasonableness of defendant's decision to use deadly force"); State v. Whitney-Biggs , 147 Or. App. 509, 527-28, 936 P.2d 1047, rev. den. , 326 Or. 43, 943 P.2d 633 (1997) (in case in which the defendant was charged with murdering her husband, evidence that the victim had abused his former wife was not relevant to the defendant's "reasonable belief" about whether she needed to defend herself because she did not know of the victim's prior abusive conduct).
Defendant contends that cases like those cited above do not apply here because the facts on which Sheridan's danger assessment was based were all known to defendant. We are not persuaded. Although the historical facts on which Sheridan based his assessment were known to defendant (indeed, they were the facts as described by defendant), Sheridan evaluated the significance of those facts using information or expertise that was not known to her. Again, the "reasonableness" question when it comes to a self-defense claim is whether the circumstances as known to the defendant would lead a reasonable person who experiences those same circumstances to perceive the use of force to be necessary. See State v. Hollingsworth , 290 Or. App. 121, 129, 415 P.3d 83 (2018) (whether proffered evidence is relevant to a self-defense claim turns on whether the evidence would be "probative one way or another of the circumstances that defendant confronted that night" in a way that "bear[s] on whether a reasonable person, in the same circumstances, would perceive the force used by defendant to be necessary"); State v. Bassett , 234 Or. App. 259, 264, 228 P.3d 590, rev. den. , 348 Or. 461, 234 P.3d 983 (2010) ("The defendant's belief [that self-defense is necessary] must * * * be objectively reasonable, as judged 'from the standpoint of a reasonable [person] under the same circumstances.' "). Accordingly, the view of another person whose opinion on the reasonableness of a defendant's use of force is informed by additional information or *577 expertise-information that the defendant did not have-is not relevant to whether the defendant reasonably believed that she needed to use force in self-defense.
The point is made, in a different context, in Oliphant . A defendant in that case (Wood) was charged with crimes including resisting arrest. He raised a self-defense claim, arguing that he was entitled to use force to defend himself against what he reasonably believed to be police officers' unlawful use of force against him, whether or not the officers' use of force was actually unlawful. 347 Or. at 190, 218 P.3d 1281. The trial court gave the uniform self-defense instruction. Id . at 185-86, 218 P.3d 1281. However, it also instructed the jury about the degree of force that officers are justified in using while making arrests, which turns on the officers' reasonable belief about the need for their own use of force. Id . at 186-87, 218 P.3d 1281.
The Supreme Court held that the trial court erred when it gave that latter instruction. Id . at 194, 218 P.3d 1281. The court explained that Wood was entitled to a self-defense instruction that asked the jury to assess the reasonableness of his belief "from his own point of view." Id . The court based that holding on the wording of ORS 161.209, "which makes the defendant's reasonable belief that unlawful force was being used (or about to be used) against him paramount." Id . (emphasis in original). Accordingly, when the trial court instructed the jury to consider whether the officers' use of force was reasonable, it "inserted an irrelevant issue-the arresting officers' actual state of mind-into the jury's deliberations concerning Wood's claim of self-defense." Id .
*499 "Instead, Wood was entitled to have his right to self-defense explained to the jury in terms of what a reasonable person in his position would have believed was occurring. What the officers believed was not (indeed, could not have been) any part of Wood's state of mind."
Id .
That explanation from Oliphant is helpful here. The jury instruction in that case was problematic because it invited the jury to consider information not known to the defendant (of the officers' perception of the reasonableness of their actions) in assessing the reasonableness of the *578 defendant's belief that he needed to use force in self-defense against unlawful conduct by the police. An analogous problem would exist if Sheridan's "danger assessment" evidence had been admitted here. Defendant would have invited the jury to consider that information not known to defendant (of Sheridan's expert perception of the danger that J posed to defendant) in assessing the reasonableness of defendant's belief that she needed to use force to defend herself against a threat posed by J.
In Oliphant terms, Sheridan's danger assessment was irrelevant because it was not-and could not have been-any part of defendant's state of mind, which is "the only state of mind relevant to [a] defense of self-defense." Id . at 194 n. 16, 218 P.3d 1281. Put differently, an expert's view of what was "reasonable" is irrelevant because the question is not whether in fact defendant was in danger and needed to defend herself. Rather, the only question is what a reasonable person in defendant's circumstances would have perceived to be necessary.
OEC 404-1 does not change the analysis. That rule provides, in pertinent part:
"(1) In any proceeding, any party may introduce evidence establishing a pattern, practice or history of abuse of a person and may introduce expert testimony to assist the fact finder in understanding the significance of such evidence if the evidence:
"(a) Is relevant to any material issue in the proceeding; and
"(b) Is not inadmissible under any other provision of law including, but not limited to, rules regarding relevance, privilege, hearsay, competency and authentication."
Here, consistent with OEC 404-1(1), the trial court allowed defendant to elicit expert testimony from Sheridan that explained the significance of events like those that defendant experienced. The court said, for example, that defendant could ask Sheridan about a particular fact pattern and whether those circumstances would be "consistent or inconsistent with a domestic violence scenario." And Sheridan testified about such matters, describing risk *579 factors for domestic violence, including several (e.g. , unemployment, having children in the household who are not the children of the abuser, alcohol abuse) that were reflected in defendant's relationship with J.
The trial court correctly excluded the additional evidence that defendant wanted to elicit-that, based on defendant's description of J and her relationship with him, J ranked a "23" (meaning "extreme danger") on a danger-assessment scale. That numeric ranking would not have provided the jury with information that would help it better understand the significance of the evidence it had already heard about the abuse that defendant had experienced, risk factors that were present in her relationship with J, and how those kinds of circumstances increased the risk of more serious domestic violence. Indeed, defendant did not contend that the numeric ranking would be helpful in that way. Rather, defendant wished to introduce the numeric ranking to establish the "reasonableness of [defendant] defending herself and her state of mind." Under Easley , Ryel , and Whitney-Biggs , however, the numeric ranking was not relevant to establish the reasonableness of defendant's belief that she needed to act in self-defense. By its own terms, OEC 404-1 does not make relevant what otherwise is irrelevant. OEC 404-1(1)(b). The trial court therefore did not err when it precluded Sheridan from testifying about the danger-assessment score.
Affirmed.

The matters about which defendant and J argued are mostly irrelevant to this appeal, so we do not describe them here. One point of disagreement does, however, relate to statements that defendant later made to a police officer, alleging that she had been sexually assaulted by a woman who attended the party that night. During their argument, J asserted that the encounter between defendant and the woman had been consensual.

At trial, defendant testified that she did not know why she told the 9-1-1 operator that the baby must have been playing with the phone; she was not aware that J had called 9-1-1. She could not process that she had just shot her husband.

Sheridan also described an area of swelling on defendant's forehead that showed in another photograph taken the same evening. On cross-examination, Sheridan acknowledged that that type of swelling could be caused by a person purposely hitting her own head against an object. Evidence from a police-car video camera was introduced later in the trial. That recording, taken while defendant was being transported after the shooting, showed defendant pressing her forehead against a horizontal piece of metal that formed part of the panel dividing the front from the back of the patrol car. An officer acknowledged that defendant "would have had to have been applying some type of pressure in order to be able to * * * keep her head there" during the transport.

The trial court prohibited defendant from questioning Sheridan on other matters. We discuss those matters in conjunction with our analysis of defendant's third assignment of error, which challenges the ruling excluding that additional evidence.

Oliphant involved a claim of self-defense under ORS 161.209, not a claim under ORS 161.219, the statute implicated here because of defendant's use of deadly physical force. However, the two statutes are identical in pertinent part, as they both focus on what "the person reasonably believes" to be a threat.