Argued and submitted August 23, affirmed November 27, 2019

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JAMES HAROLD FORSHEE, III,
aka James Harold Forshee, II,
*Defendant-Appellant.*

Klamath County Circuit Court
1400813CR; A166497

455 P3d 1025

Defendant appeals a judgment of conviction for murder. Defendant assigns error to the trial court's denial of his motion to suppress his statement, "I shot the guy," which was made in response to an officer's question about defendant's involvement in the shooting before defendant was read his *Miranda* warnings. Defendant contends that that statement was obtained in violation of his rights under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution. *Held*: Even if the trial court erred in admitting defendant's statement because it was obtained in violation of defendant's rights under Article I, section 12, any such error was harmless. Furthermore, defendant's statement was not obtained in violation of his Fifth Amendment rights, because the officer's question fell within the public safety exception to the *Miranda* warning requirement, as articulated by the United States Supreme Court in *New York v. Quarles*, 467 US 649, 104 S Ct 2626, 81 L Ed 2d 550 (1984).

Affirmed.

Dan Bunch, Judge.

Laura A. Frikert, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Michael Casper, Assistant Attorney General, argued the cause for respondent. On the briefs were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and E. Nani Apo, Assistant Attorney General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

TOOKEY, J.

Affirmed.

**TOOKEY, J.**

Defendant was charged with one count of murder and he asserted the affirmative defense of extreme emotional disturbance at trial. The jury was not persuaded by that defense, and it found defendant guilty of murder. Defendant appeals the judgment of conviction for murder, ORS 163.115,[1] assigning error to the trial court's denial of his motion to suppress his statement, "I shot the guy," which was made in response to an officer's question about defendant's involvement in the shooting before defendant was read his *Miranda* warnings.

For the reasons set forth below, we conclude that, even if the trial court erred in admitting that statement because it was obtained in violation of defendant's rights under Article I, section 12, of the Oregon Constitution, any such error was harmless. We also conclude that that statement was not obtained in violation of defendant's rights under the Fifth Amendment to the United States Constitution, because the officer's question fell within the public safety exception to the *Miranda* warning requirement, as articulated by the United States Supreme Court in *New York v. Quarles*, 467 US 649, 104 S Ct 2626, 81 L Ed 2d 550 (1984). Accordingly, we affirm.[2]

---

[1] ORS 163.115 was amended in 2015 and again in 2019. Or Laws 2015, ch 820, § 46; Or Laws 2019, ch 635, § 4. However, those amendments do not apply to this case. Or Laws 2015, ch 820, § 51; Or Laws 2019, ch 635, § 30. Accordingly, we apply the 2013 version of the statute, which was in effect when defendant committed the murder in 2014.

[2] Defendant also assigns error to the trial court's denial of his motion for a continuance on the morning of trial. We reject that assignment of error without discussion.

Furthermore, in a supplemental assignment of error, defendant contends that "[t]he trial court erred in instructing the jury that it could reach a nonunanimous verdict on the charge of murder," because "Article I, section 11, of the Oregon Constitution requires jury unanimity as to a murder charge," and because "[t]he Sixth and Fourteenth Amendments [to the United States Constitution] require unanimous verdicts." We reject defendant's federal constitutional arguments, on the merits, without further discussion. Defendant is correct that, under Article I, section 11, "unanimity [i]s required for the jury to convict defendant of murder." *State v. Lomax*, 288 Or App 253, 261, 406 P3d 94 (2017). Under the circumstances of this case, however, we conclude that the instructional error was harmless. Despite the trial court's instruction that the jury could reach a nonunanimous verdict for murder, the jury returned a unanimous guilty verdict. Moreover, defendant did not dispute that he shot and killed the victim and we find nothing in the record that indicates that the jury would have rendered a nonunanimous

## I. BACKGROUND

Because we ultimately conclude that any error in admitting defendant's statement under Article I, section 12, was harmless, we review "all pertinent portions of the record to determine if there is little likelihood that any error affected the verdict." *State v. Jones*, 296 Or App 553, 556, 439 P3d 485 (2019) (internal quotation marks and brackets omitted). With respect to defendant's Fifth Amendment claim, "[w]e review the denial of a motion to suppress for legal error, and we are bound by the trial court's implicit and explicit factual findings of historical fact as long as the record [of the suppression hearing] includes constitutionally sufficient evidence to support those findings." *State v. Walker*, 277 Or App 397, 398, 372 P3d 540, *rev den*, 360 Or 423 (2016). We state the facts in accordance with that standard.

### A.   *Evidence Not Challenged on Appeal*

"We begin by reviewing the pertinent evidence that was introduced at trial, not including the evidence that was the subject of defendant's suppression motion, which we describe later in the opinion." *Jones*, 296 Or App at 556. Because the trial spanned multiple days and the transcript is lengthy, our description of the historical facts necessarily summarizes certain evidence instead of setting it out in detail.

The victim had been defendant's immediate supervisor for about two years, and defendant felt that the victim had singled him out for discipline on multiple occasions. On April 10, 2014, the victim had "written up" defendant at work for a forklift violation, and defendant became concerned that he would be fired as a result. Defendant stated that he "snapped" when he got the write up and thought to himself, "I've got to stop this guy" by "shoot[ing] him." Although defendant was "very upset" about the write up, defendant was not "exhibiting signs of extreme distress,"

---

verdict had it been instructed that its verdict must be unanimous. Hence, the asserted error does not supply a basis for us to reverse the judgment. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) ("Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict?").

and he was able to "control himself," take time off of work, and go home.

Defendant also stated that, after the write up, defendant began to think about killing the victim "every second of the day," and he began planning out the shooting. Defendant had previously told several of his coworkers that he was "going to use prison as [his] retirement." Ultimately, defendant decided to kill the victim because defendant was "60 years old, had no family or kids, and [because the victim] *** had to be stopped."

That afternoon, defendant's coworker and union representative, Freitag, called defendant. Defendant was "very upset" and Freitag let defendant know that he did not think defendant would be fired for the forklift violation and that "the worst that he would get would be probation." Later that afternoon, Freitag called defendant again and Freitag thought that it sounded like defendant had "calmed down;" defendant had a conversation with Freitag about asparagus being on sale at the grocery store.

About one week before the murder, defendant also spoke with his brother. Defendant complained about work, but nothing that defendant said gave his brother any concern or made him believe that defendant "was having a mental issue" that would require any help. Defendant's brother described it as a "normal conversation" and stated that he "never *** thought" that defendant would kill the victim.

On April 13, defendant reserved a taxi cab to take him to work on April 17, because he "intended to kill [the victim]" that day, and defendant repeatedly called the taxi company "every day [before the shooting] just to confirm that his reservation was still good and that a cab would be there to pick him up when he had requested." Defendant's truck was operational, but defendant explained that he reserved a cab because he did not "want to leave [his] pickup truck in the lot [at work] if *** [he] shot [the victim] and got arrested." Defendant also had two chihuahuas that "meant a lot to [him]," and he decided to get rid of the dogs a "couple days" before the shooting. Defendant stated that he got rid of his dogs "because there was no one going to be there to take care of them" after he shot the victim.

The day before the murder, defendant spoke with his neighbor, who had known defendant for two-and-one-half years. Defendant and his neighbor talked about defendant's boss giving him a hard time about the forklift violation and defendant being written up. Nothing made defendant's neighbor concerned that defendant was planning to do something as drastic as murdering the victim, because defendant did not seem like he was "having some kind of crisis" or otherwise needed any help.

On April 17, the morning of the murder, defendant selected a .45 caliber pistol from his gun collection because it was concealable, loaded it with a full magazine of bullets that are "meant to open and expand upon impact," chambered a round, loaded a second magazine, and concealed the pistol in his vest pocket.

Defendant also decided to put in earplugs before he left his home, because he did not want to ruin his hearing when he shot the victim. In the meantime, the taxi cab was having trouble finding defendant's home and had to call defendant for directions. Defendant was "pleasant" when the cab driver called, and defendant was able to give the cab driver accurate directions to defendant's home. When the taxi arrived, defendant was already outside, and defendant got inside of the taxi and gave the driver directions to defendant's work place. On the way to work, defendant realized that he had forgotten his lunch at home, but he decided that he did not need to return home to get it. Although defendant was "pretty quiet," defendant did not appear "disheveled," and the taxi driver described it as "a normal fare."

Defendant arrived at work in the taxi and entered the building where four of his coworkers and the victim were present. Defendant sat down next to one of his coworkers, Smith. Smith said good morning to defendant, and defendant "looked up *** [with] a half smile" and nodded at Smith. Another coworker, Dotson, asked defendant about his dogs, and defendant shook his head and pointed towards the victim's office. Dotson told defendant that the victim was in his office, and defendant walked over to the victim's doorway.

At that point, defendant stepped inside of the victim's office, pulled out his gun, and shot the victim three times in the upper right chest, four times in the head, once in the left shoulder, and once in the left hand.

After defendant fired the first two shots, Smith ran out of the building and called 9-1-1. Defendant then fired five more rounds, paused, stepped back, and said, "Fuck that motherfucker." Defendant then took the gun "back off safety" and shot the victim two more times. Dotson saw defendant pull an earplug out of his ear and put his gun away, and then Dotson ran out of the building and called 9-1-1.

The only coworker to remain in the building, Krass, called 9-1-1 while defendant sat down at a desk, folded up his jacket, and set the gun and the clip down on top of it. Krass said that defendant was "cool and calm" after the shooting, and, when Krass mistakenly told the 9-1-1 operator that the shooting occurred in building number two, defendant corrected Krass and informed him that the shooting occurred in building number four.

When the police started to arrive, defendant got up and said, "it's time to go meet the police." Defendant thought that the victim "deserved to die" and that "the killing that day seemed rational."

Officer Benson received a call from dispatch about a possible homicide and headed to the scene of the shooting. Dispatch informed Benson that the shooter and the gun were still at the scene. Benson was the first officer on the scene and, when Benson pulled up to building number four, he saw defendant standing in the parking lot with his hands up. Benson was unsure what defendant's involvement was in the shooting. Benson ordered defendant to turn around, walk backwards, and then lie down on the ground with his arms out and his feet crossed. Benson handcuffed defendant, and asked defendant, "what is your involvement here?" Defendant's answer to that question, "I shot the guy," was the subject of his suppression argument, which we describe in more detail below. Benson did not ask defendant any further questions, helped defendant to his feet, and transferred

custody of defendant to another officer, Loudermilk. Benson described defendant's demeanor as "cooperative," "calm[,] and collected," and Benson did not observe anything that made him think that defendant was having an emotional or mental health crisis.

After learning from Benson that defendant was the shooter, Loudermilk escorted defendant to his patrol car, placed defendant in the back seat, and advised defendant of his *Miranda* rights. Defendant stated that he understood his rights and, when Loudermilk asked defendant what had happened, defendant said, "This guy has been harassing me and trying to destroy my life and the lives of half the people here; I just had all I could take." At that point, Loudermilk transferred defendant to the police department and detained defendant in an interview room. Loudermilk described defendant's demeanor as "calm and matter-of-fact," and Loudermilk did not observe any signs of intoxication or mental health issues.

Lieutenant Daniel was at the police department when Loudermilk arrived with defendant. Daniel assisted Loudermilk in opening the interview room and stood by while Loudermilk got defendant situated and removed his handcuffs. Daniel stated that defendant "was very compliant," that "nothing *** stood out about his demeanor," and that he did not see any signs of defendant "suffering from an extreme emotional issue."

Detective Gourley arrived at the police station shortly thereafter to photograph defendant, seize defendant's clothes, and obtain a sample of defendant's DNA. Gourley stated that defendant was "very calm" and "cooperative," and Gourley did not see any signs that defendant was under the influence of an extreme emotional disturbance. Detective Foreman also interacted with defendant at the police station. Foreman likewise described defendant's demeanor as "very calm" and "casual," and Foreman did not observe any signs that defendant "was suffering from some extreme emotional disturbance." Detective Miller also had the opportunity to observe defendant at the police station. Miller also did not observe anything that made him feel like defendant was having an "emotional crisis."

## B.  *Evidence of Defendant's Statement Admitted Over His Objection*

Defendant was charged with one count of murder, and, before trial, defendant filed a notice of intent to rely on the affirmative defense of "extreme emotional disturbance," (EED) ORS 163.115(1)(a), ORS 163.118, and ORS 163.135.[3] For its part, the state filed a motion for a *Jackson/Denno* hearing "to determine the admissibility of [the] statement[] made by defendant to law enforcement."[4]

The defendant made the responsive statement at issue after being held at gunpoint, placed in handcuffs, and asked, "what's your involvement here?" The state conceded that defendant was in custody when he made the responsive statement to Benson, "I shot the guy," and had not yet been read *Miranda* warnings. Nonetheless, the state argued that Benson's question fell under the *Quarles*, 467 US 649, "public safety" exception to the *Miranda* warning requirement under the Fifth Amendment to the United States Constitution, because Benson was arriving on a "scene that has multiple people where somebody has already been shot,"

---

[3] ORS 163.115(1)(a) (2013) provided, in part, that, "[e]xcept as provided in ORS 163.118[,] *** criminal homicide constitutes murder" when "it is committed intentionally, except that it is an affirmative defense that, at the time of the homicide, the defendant was under the influence of an extreme emotional disturbance." ORS 163.118(1)(b) (2013) provided that "[c]riminal homicide constitutes manslaughter in the first degree" when "[i]t is committed intentionally by a defendant under the influence of extreme emotional disturbance as provided in ORS 163.135, which constitutes a mitigating circumstance reducing the homicide that would otherwise be murder to manslaughter in the first degree and need not be proved in any prosecution." ORS 163.135(1) (2013) provided:

"It is an affirmative defense to murder for purposes of ORS 163.115(1)(a) that the homicide was committed under the influence of extreme emotional disturbance if the disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act and if there is a reasonable explanation for the disturbance. The reasonableness of the explanation for the disturbance must be determined from the standpoint of an ordinary person in the actor's situation under the circumstances that the actor reasonably believed them to be. Extreme emotional disturbance does not constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[4] *See Jackson v. Denno*, 378 US 368, 376-77, 84 S Ct 1774, 12 L Ed 2d 908 (1964) (when the state seeks to admit statements that a defendant made to police officers, the defendant has a constitutional right "to have a fair hearing and a reliable determination on the issue of voluntariness" under the Due Process Clause of the Fourteenth Amendment).

and because Benson did not know who the shooter was, only that the shooter and the firearm were still "on the scene somewhere." Furthermore, the state acknowledged that "Oregon has not ruled *** on whether a public safety or rescue doctrine exists under" Article I, section 12, of the Oregon Constitution, but it urged the trial court to recognize such an exception under state law and to apply the framework articulated by the United States Supreme Court in *Quarles*. Defendant disagreed, arguing that the "statement should be suppressed because it's clearly [a] custodial statement without *Miranda* warnings."

The trial court agreed with the state and concluded that defendant's statement, "I shot the guy," was admissible because "Benson's sole question to the defendant was necessary for reasons of his own safety and that of the general public." The trial court explained that the public safety exception to the *Miranda* requirement applied because,

> "[a]s the first officer on-scene, Benson faced extreme exigencies, primarily occasioned by the facts that he knew there had been a shooting, that he did not know with certainty that there was only one shooter, that the shooter was still at large, that he had no idea whether the shooter intended further violence, *** he was working with the assumption that the shooter was still armed[,] *** [and] Benson did not know whether or not *** defendant was a suspect."

In accordance with that ruling, the trial court allowed Benson to testify about defendant's response to his question as follows:

> "[Benson:] So I walked up behind [defendant], I holstered my weapon, removed a set of handcuffs and placed him into handcuffs behind his back.
>
> "[State:] Did you ever speak with him?
>
> "[Benson:] I do; I said, what is your involvement here, and he responded to me, and I'll quote off my police report, he said, quote, 'I shot the guy.'
>
> "[State:] What was your reaction to him telling you that?
>
> "[Benson:] After he said that I didn't ask him anything else; I did a quick officer safety pat down to make

sure there wasn't any weapons that he could reach; I helped him to his feet and then *** Officer Loudermilk arrives on scene a short time later and I help [defendant] to his feet and transfer custody to Officer Loudermilk."

As discussed, Loudermilk escorted defendant to his patrol car, placed defendant in the back seat, and advised defendant of his *Miranda* rights. Defendant's challenge on appeal relates only to the admissibility of his statement, "I shot the guy"; defendant does not challenge the admissibility of any statements that he made after being advised of his *Miranda* rights.

C.   *Expert Testimony*

At trial, multiple people testified, including defendant, as to the background facts that we summarized above, and there was no dispute that defendant shot and killed the victim in an office at their mutual workplace, while four of defendant's coworkers were present. The state's theory, as described in its opening statement, was that defendant intentionally killed the victim and that defendant's "goal-directed behavior over the period of 6 days" and defendant's demeanor before, on, and after the day of the shooting would show that defendant was not under the influence of an EED when he killed the victim. As discussed, defendant's theory was that he killed the victim while he was under the influence of an EED.

As pertinent here, both parties introduced expert testimony about EED.

To refute defendant's EED defense, the state called Dr. Duncan, a clinical and forensic psychologist, who had interviewed defendant on two occasions and reviewed several reports and records pertinent to this case. Duncan explained that EED is typically a "more temporary, *** more impulsive, emotionally driven behavior," such as when "the husband comes home and sees the wife having an affair and responds with rage and kills the person," and "so it's kind of a more immediate reactive sort of violent pathway." According to Duncan, a "better candidate for an EED" defense is where there is an "immediate response with the aggression" that is "triggered by something that's

provocative or even threatening." Duncan opined that "it's possible" for an EED to last more than one day but, in his experience, "it tends not to last that long" because the "key question is to what extent was there a loss of control" at the time the defendant committed the homicide.

In evaluating "impulsive violence versus self-controlled violence," Duncan explained that he looks at several "stages" of the defendant's behavior. First, Duncan explained the "baseline stage," where he looks "at the hours [and] the days leading up to the incident" to evaluate whether the defendant engaged in more "self-controlled violence where *** the [victim] is not necessarily a threat and there's *** premeditation planning during the days *** [and] hours leading up or *** the person's thinking about the act itself" and engaging in "more goal-directed behavior."

In Duncan's view, defendant's actions in the days leading up to the shooting showed that this was a controlled act of violence that was exemplified by defendant's goal-directed behavior during that time. Specifically, Duncan pointed to the facts that defendant had already made the decision to kill the victim one week before the shooting occurred, reserved a cab to ensure that his truck would not be left at work when he was arrested, called the cab company every day to confirm his reservation, and gave away his dogs. Duncan also found it "significant" that defendant decided to bring earplugs "to protect his ears with the plan to go in and shoot [the victim]" and it shows that defendant "spent a good deal of time thinking about going and killing him." In addition to taking a taxi to work, Duncan noted that defendant's decision to not bring a lunch, which was also a break from defendant's routine, indicates that defendant "wasn't there to go to work" because he had already formulated a plan to kill the victim instead. Defendant had also made a comment to Duncan "that he was going to shoot his boss if everything went as it should," which "denote[d] a plan, not only just a plan but a plan with a number of steps to it." Duncan stated that, although defendant "was ruminating [about] the alleged murder" during that time, "he was able to calm down, go to sleep, regroup, *** [and]

refocus on the next day" to carry out his plan, which suggested that defendant was "able to deescalate."

With regard to the second "stage," Duncan explained that the "escalation phase" is where you examine whether the violence is impulsive and triggered by an emotional response by looking for "more acute signs of emotional distress, s[uch as] confusion, disorganized thinking, tearfulness, crying, startle reactions," or "sensitiv[ity] to the environment." Duncan further explained that when "emotion is *** taken out of the equation[,] *** the person seems more organized, deliberate in their efforts, even hyper focused in their attempts to carry out the act."

Duncan noted that, in the days before the shooting, defendant complained about work, but that he otherwise "seemed fine" when he spoke to his brother and neighbor. In addition, Duncan stated that defendant's ability to have an "intelligent conversation with the taxi driver," give the taxi driver directions, and decision to continue to work despite leaving his lunch at home "speak[s] to his ability to *** self-regulate, deal with that situation, [and] *** move on *** with the plan," and to defendant's "capacity to make decisions."

In "looking at [defendant's] emotional capacity at the time, cognitive capacity, [Duncan observed that] he's able to engage coworkers, interact with them briefly before going in [the victim's] office and carrying out the act," and that defendant "appear[ed] calm" and "relaxed," and was "not showing signs of acute distress." Moreover, when defendant showed up at work the day of the shooting he was clean shaven, which gave a sense that defendant was "functioning at the time" and was not so impaired that he was unable to groom himself or take care of his "personal needs." Thus, defendant "was able to maintain self-control throughout the moment he started interacting with people from the taxi driver all the way through his final interactions with law enforcement," which demonstrates that defendant had the "emotional control and capacity to socially engage." Finally, Duncan testified that defendant bringing a gun, extra magazine, and earplugs, and defendant's repeated calls to the cab company, showed

defendant's "focused attempt" to carry out the act and "mental rehearsal of [the] crime sequence," as well as a "concerted effort in order to accomplish a goal."

With respect to the third stage, Duncan explained that the "actual violence stage" is examined by looking at whether the violence was impulsive and disorganized or "more organized and directed." Here, the violence was "targeted" and "focused" on the victim, and defendant shot the victim a number of times in the chest and head, which indicated to Duncan that defendant was "trying to hit those areas of the body," particularly in light of defendant's "organized behavior" and "calm presentation after the incident." Defendant's ability "to hit or penetrate vital body parts when he was shooting" the victim suggested to Duncan that this was not a case of "emotionally based violence or impulsive violence." Moreover, there was no indication that defendant ever threatened his coworkers or pointed the gun at them, and, once the victim had been shot multiple times, the violence stopped. Duncan concluded that defendant's ability to "stay[] calm, focused, [and] directed at [the victim]" demonstrated that defendant had a "controlled mood during [the] infliction of violence."

With respect to the fourth "stage," the "recovery period," Duncan explained that he assesses how the person looks after the act to see whether the person was still exhibiting "signs of emotional stress" and "emotional reactivity," or whether the person was "not as emotionally affected" by the act of violence.

After defendant killed the victim, defendant sat down in the office, folded up his jacket, and set his gun and clip down on top of the jacket while Krass called 9-1-1 and identified defendant as the shooter. Defendant stated that the victim "asked for it," and Krass described defendant as "cool and calm" after the shooting. Duncan testified that defendant's "calm" and "relaxed" appearance demonstrated that defendant was not "showing signs of acute distress" after the shooting. Furthermore, when Krass mistakenly told the 9-1-1 operator that building number two was where the shooting had occurred, defendant corrected Krass and informed him that the correct building was number four.

Along those same lines, when the police arrived, defendant got up and said, "it's time to go meet the police." According to Duncan, "what you can deduce from that is that he's oriented to his situation, like what's happened, what's just taken place, he's processing *** Krass' phone call and correcting that as needed. He knows what he did and what's going to happen."

Duncan testified that you can also "get[ ] the sense that he realized what he did" by the "'I' statements" that defendant made to officers shortly after the shooting, including defendant's statement to Benson, "I shot the guy." Duncan further observed that defendant was also able to describe with an "'I' statement" what his motivation was. Duncan described defendant's statement to Loudermilk, "This guy has been harassing me and trying to destroy my life and the lives of half the people here; I just had all I could take," as a "key piece of data as [to] why he did do what he did" and noted that that statement was consistent with what he told the psychiatrists in subsequent interviews. He also noted that that statement showed that defendant was able to "express[ ] his feelings" and "verbaliz[e] his complaints *** to law enforcement." According to Duncan, those two "'I' statements" also showed that defendant "was aware of the wrongdoing of the violence he committed."

In light of defendant's ability to listen in on the 9-1-1 call and correct Krass as to the location of the shooting, and defendant "reporting to officers what he did and why he did it," Duncan concluded that defendant "was aware of his surroundings" after the shooting.

Finally, Duncan explained that he evaluates the person's "return to baseline" after the event because, if the person has "engaged in a serious impulsive violent act," the person "may have difficulties remembering" or "even maybe show signs of being traumatized by the event itself," whereas a person who is less traumatized by the event may have a "better memory recall of the event" or "more positive memories of the act itself."

When defendant was asked how he felt about causing the victim's death, defendant continued to believe that the victim "deserved to die." Defendant also stated that he

felt "peaceful" and "relaxed" and like "he did a good job" after he completed the shooting. Additionally, defendant told his expert during an interview that it was a "rational decision" to kill the victim and that he did not regret killing the victim. Duncan concluded that defendant's lack of remorse after the shooting was "consistent with the model of the self-controlled violence."

Based on those observations, Duncan concluded that, although defendant was under some stress and had "a depressed mood," this was more typical of a case of "goal-directed behavior" and "self-controlled violence" rather than EED.

To support his EED theory, defendant offered the testimony of Dr. Cooley, a forensic psychologist. Cooley interviewed defendant on two occasions and reviewed the police reports and defendant's medical records. Cooley diagnosed defendant with "major depression with psychotic features, an anxiety disorder, *** and long-standing personality characterological issues." Cooley testified that defendant's depression, anxiety, and other issues would contribute to defendant being under the influence of an EED at the time of the shooting because defendant "is more likely to be immobilized by [his] emotional difficulties than someone who doesn't have that underlying mental illness" and "that means that [his] ability to think and reason and make decisions is going to deteriorate more quickly than someone who does not have a psychological or mental health issue." In Cooley's opinion, defendant's mental health issues are "very important to this [EED] analysis" because, if "you are not thinking rationally" due to mental health issues, "you don't see logical alternatives and you don't know what to do *** so your mind is controlled by your emotions rather than your reason."

Cooley observed that the write up was a "very major issue" for defendant because defendant "didn't have much in his life" other than his job, had several health problems, "didn't see the possibility of really getting another decent job," and "was really worried about what would happen to him financially" if he lost his job. In addition, Cooley testified that "a person [can] stay in a state of extreme distress

for days on end" because when "something horrible happens and then they ruminate, and they think about it, \* \* \* it gets bigger and it gets worse," so "oftentimes over a period of time the stress actually increases rather than decreases." Cooley acknowledged, however, that EED "is a temporary state of mind" that one could not stay in forever because "something usually \* \* \* happens to break that state," and "if it's interrupted and the person is no longer suffering from [EED] and commits a homicide then that defense would not apply." Cooley concluded that defendant was "in a state of disturbance" and that there was nothing in the "break in time between getting written up and the shooting" that broke defendant's state of "distress."

D. *Closing Arguments and the Verdict*

In addition to explaining how the evidence supported a conviction for the charged crime of murder, the state's closing argument focused on defeating defendant's EED claim. The prosecutor began by summarizing the testimony of all of the witnesses in the order that they testified and urging the jury to find that this was a "coldblooded, premeditated, well thought out and planned execution."

The first time the prosecutor referenced the challenged statement, "I shot the guy," was when the prosecutor summarized Benson's testimony as follows:

> "He was the first on the scene; he gave [defendant] multiple commands, [defendant] understood those commands, he obeyed those commands, he was cooperative; he was described as calm. There were no signs of impairment, he was calm and collected and he reacted as a normal citizen. [Benson] considered [defendant] to be a normal citizen until [defendant] said the following: I shot the guy."

The prosecutor continued to argue that defendant was not under the influence of an EED at the time of the shooting, specifically noting that defendant had also corrected Krass as to the correct building number where the shooting had occurred when Krass called 9-1-1, that Krass described defendant as "calm, cool, and collected after the shooting," and that "when the police showed up he said, it's time to go meet the police."

The second time the prosecutor referenced the challenged statement was when he summarized Loudermilk's testimony:

"[Loudermilk] had daily interactions with mental health issues, didn't see anything, as none of the officers did or other people that worked with him, that made him think that he was under an Extreme Emotional Disturbance. Described him as calm and matter-of-fact; [defendant] responded appropriately to questions, in other words he didn't say, what's your name and he says blue. He told him what his name was. He was even able to give "I" statements; I shot the guy. And then he tells him, this guy has been harassing me and trying to destroy my life and the lives of half the people here, I had all I could take. He gives him his reason, his motive."

The prosecutor then described how two of the other police officers' testimony also reflected that defendant was "calm" after the shooting and was not "suffering from any kind of emotional distress."

The prosecutor emphasized the expert testimony on EED as the "most important," and stated that the jury would need "to compare doctors and *** use your common sense and reason in deciding *** if th[e] six days between [defendant's] write-up when he snaps and committing the crime, when this huge amount of premeditated plan takes place, [defendant] is still in the heat of passion." The prosecutor argued:

"EED is rare, and the key thing you're looking for is a loss of control in Extreme Emotional Disturbance. It's a temporary emotionally-driven state. Temporary is the key; this sprung out from heat of passion. Again, finding your spouse involved in an affair or you're standing outside playing catch with your son and he runs after the ball and he gets run over by somebody who's drunk. You respond immediately, and you kill that person. The defense wants you to think that you can wait up to six days, plan that murder and come back to kill the person who is sleeping with your wife or find that person that ran over your child and kill him. Nobody has testified of an occurrence that they're aware of that lasted more than a day. Dr. Duncan said specifically it is unlikely to last more than a day, and Dr. Cooley said at best it could. But again, couldn't give you

one example of an Extreme Emotional Disturbance where that disturbance lasted for a long time."

The final time the prosecutor mentioned the challenged statement was when the prosecutor argued generally that the evidence, including defendant's interactions with people before and after the shooting, defendant calling a taxi and giving away his dogs, and defendant's choice to use earplugs during the shooting, show that defendant was not being impulsive and that this was "goal-directed behavior" that was inconsistent with defendant's EED claim. In doing so, the prosecutor also argued that defendant had "[a]wareness of wrongdoing during [the] violence" because defendant "wait[ed] for police" and told "them immediately afterwards, I shot the guy and tells them why."

Defendant's closing argument focused on his EED claim, based partly on the evidence that defendant was "a year or two years from retirement with several health concerns, several mental health concerns," and the fact that defendant had been written up and thought that he would be fired as a result. Defendant emphasized that "Dr. Duncan and Dr. Cooley agree[d] on three primary things that [the jury] need[s] to consider": (1) defendant "was suffering from a mental illness, at least depression, that can cause the brain to malfunction," (2) that EED "can last for days," and (3) that defendant "was under a great deal of stress." Based on the evidence of defendant's mental health issues and defendant's belief that he thought he was going to be fired and lose his retirement as a result of the write-up, defendant argued that he was under the influence of an EED that caused him to lose the ability to forego the homicide, and, thus, the jury should convict him of first-degree manslaughter.

The jury found defendant guilty of murder.

## II.  ANALYSIS

### A.  *The Parties' Arguments on Appeal Regarding the Admissibility of Defendant's un-*Mirandized *Statement*

On appeal, defendant contends that the trial court erred when it refused to suppress defendant's statement, "I shot the guy," that he made after Benson ordered him to the ground at gunpoint, before Benson had read defendant

his *Miranda* warnings. Defendant asserts that Benson violated his rights under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution by interrogating him in custody without having first *Mirandized* him. Defendant acknowledges that the United States Supreme Court recognized a "public safety" exception to the *Miranda* requirement in *Quarles*, but he argues that it does not apply here because the "exigency did not justify the questioning of defendant" and because Benson's "questioning was not safety related." Defendant also argues that no analogous exception applies under the Oregon Constitution, because "[t]he public safety exception is incompatible with Article I, section 12's rights-based prohibition on compelled testimony" and that, even if it does, the exception should be narrowly tailored to make Benson's question impermissible under the circumstances of this case. Finally, defendant asserts that the admission of his statement was not harmless because "the prosecution relied on defendant's statement to discredit his mental state defense, which was the only factual issue in the trial, and repeatedly drew the fact-finder's attention to it."

In response, the state argues that, because Benson's "question was reasonably necessary for his own safety and the safety of the public, and was not designed solely to elicit testimonial evidence," the *Quarles* public safety exception to the *Miranda* requirements applied under the Fifth Amendment. The state also urges us to recognize a public safety exception under Article I, section 12, contending that the reasoning articulated by the United States Supreme Court in *Quarles* for the public safety exception "applies with equal force under Article I, section 12." *Cf. Jones*, 296 Or App at 570 (leaving that question open).

At oral argument, the state acknowledged that we may not need to decide the Article I, section 12, question, if we decide that the admission of defendant's statement was harmless as we did in *Jones*, 296 Or App at 570-73. That is the case, the state asserted, because, "if you look at the record there is a lot of evidence * * * that the one statement to the officer does not seem to be particularly salient or particularly important to the state's case" given the "ton of [other] evidence that this was not EED" such as defendant

being gone from work for six days, giving away his dogs, and helping Krass call 9-1-1, and defendant's additional post-*Miranda* "I" statement to Loudermilk about his reasons for killing the victim. *See State v. Sperou*, 365 Or 121, 140, 442 P3d 581 (2019) ("[W]e have an independent obligation to consider whether defendant was prejudiced," even when the "state has not developed a harmless-error argument."). The state made clear, however, that it was not making any concessions regarding harmless error, and it continued to urge us to recognize a public safety exception under Article I, section 12.

B.   *Admissibility of Defendant's Statement Under Article I, section 12*[5]

      We do not reach the merits of the parties' Article I, section 12, arguments because our review of the record leads us to conclude, for the reasons expressed below, that there is little likelihood that the jury's verdict was influenced by the admission of defendant's single pre-*Miranda* warning statement, "I shot the guy." In other words, we conclude that, in light of the other evidence in the record, any error in admitting that statement was harmless. Thus, we need not decide whether a public-safety exception exists under Article I, section 12, and we leave that issue for another day.

      "It is defendant's burden, as the party seeking reversal based on a claim of evidentiary error, to show some likelihood that the challenged evidence affected the verdict." *Jones*, 296 Or App at 570-71 (internal quotation marks omitted).

> "In assessing whether erroneously admitted or excluded evidence affected the verdict, we consider the nature of the evidence in the context of the trial as a whole. * * * Among other factors, we consider whether the evidence was cumulative of other evidence admitted without objection, which includes assessing any differences in the quality of the erroneously admitted or excluded evidence as compared to the other evidence on the same issue. * * * We also consider how the case was tried and the extent to which the

---

[5]  Article I, section 12, provides, in part, that "[n]o person shall * * * be compelled in any prosecution to testify against himself."

disputed evidence was or was not emphasized by the parties and central to their theories of the case."

*State v. Simon*, 294 Or App 840, 849, 433 P3d 385 (2018).

We begin by "determin[ing] the particular evidentiary issue that is subject to harmless error analysis." *State v. Maiden*, 222 Or App 9, 13, 191 P3d 803 (2008), *rev den*, 345 Or 618 (2009). As defendant correctly observes, defendant did not dispute that he shot and killed the victim, and the "singular factual issue" in this case reduced to whether defendant "acted under extreme emotional disturbance." Defendant asserts that his EED defense was undermined by the admission of his un-*Mirandized* statement, "I shot the guy." In particular, defendant points to Duncan's testimony that defendant's two "I" statements, "I shot the guy," and, "I just had all I could take," gave "the sense that [defendant] realized what he did." Next, defendant points to the prosecutor's references to the challenged statement during the prosecutor's closing argument to argue that the error was not harmless.

Considering the record as a whole, we conclude that there is little likelihood that the jury's verdict was affected by the un-*Mirandized* statement that was admitted over defendant's objection. As an initial matter, defendant's statement, "I shot the guy," added very little to the evidence in the record that defendant was, in fact, the person who shot and killed the victim in front of four of his coworkers. Defendant never claimed otherwise and stipulated that he had shot the victim nine times, causing the victim's death. Accordingly, there is little likelihood that the jury's finding that defendant killed the victim was affected by the admission of that statement.

Additionally, in the context of the other evidence admitted at trial and the arguments as a whole, it is unlikely that the jury's verdict on defendant's EED defense was influenced by defendant's statement, "I shot the guy."

First, contrary to defendant's assertion, defendant's un-*Mirandized* statement was not the major focus of the state's argument that defendant was not under the influence of an EED at the time that he shot the victim.

Our review of the record reveals that it was but one of the many facts on which the prosecutor relied to refute defendant's EED defense and, as we discuss in more detail below, was merely cumulative of other evidence of defendant's demeanor and statements shortly after the shooting that tended to show that defendant was aware of the violence that he had perpetrated against the victim and was not under the influence of an EED at the time of the shooting. As noted above, the bulk of the state's argument was much more focused on the six-day time gap between the write up and the shooting, and the many steps that defendant took during that time to prepare to kill the victim, such as defendant reserving a taxi and calling to confirm his reservation every day, defendant giving away his dogs, and defendant's choice to use earplugs during the shooting. *See Maiden*, 222 Or App at 13 (in "determining the possible influence of the error on the verdict, we consider the importance of the erroneously admitted evidence to a party's theory of the case").

Second, the prosecutor also focused heavily on defendant's calm demeanor during his interactions with several people before the shooting to refute defendant's claim that he was under the influence of an EED when he shot the victim. For example, the day defendant received the write up, defendant's coworker and union representative, Freitag, called defendant to let defendant know that he did not think defendant would be fired for the forklift violation, and, when Freitag called defendant again that afternoon, it sounded like defendant had "calmed down," and defendant had a conversation with Freitag about asparagus being on sale at the grocery store. The prosecutor argued that that evidence showed that defendant had "[c]learly *** calmed down" before the shooting and was not under the influence of an EED during those six days. Likewise, the prosecutor pointed out that, when defendant spoke with his brother and his neighbor before the shooting, defendant "complained about work but he wasn't emotional," further demonstrating that defendant was not under the influence of an EED before or during the shooting. In like manner, the prosecutor reminded the jury about defendant's ability to give the taxi driver appropriate directions when the taxi driver could

not find defendant's home, and how the taxi driver had "no concerns about his demeanor" and described it as a "normal fare."

Finally, defendant's statement, "I shot the guy," was cumulative of other evidence that defendant recognized and was aware of what he had done shortly after the shooting, because the other evidence made that point just as, if not more, powerfully than defendant's challenged statement and it refuted defendant's claim that he was under the influence of an EED when he shot the victim. That evidence includes defendant's other unchallenged "I" statement to Loudermilk, which Duncan focused on, that explained defendant's reasoning for killing the victim—"This guy has been harassing me and trying to destroy my life and the lives of half the people here; I just had all I could take." Duncan described that as a "key piece of data as [to] why [defendat] did do what he did" and noted that that statement showed that defendant was able to "express his feelings" and "verbaliz[e] his complaints * * * to law enforcement." In that same vein, the prosecutor argued that defendant's ability to give "'I' statements" and "respond[] appropriately to questions" undercut defendant's EED claim.

The evidence of defendant's mental state immediately after the shooting also includes defendant's interaction with his coworker, Krass. As discussed above, immediately after defendant killed the victim, defendant sat down in the office, folded up his jacket, and set his gun and the clip down on top of the jacket while Krass called 9-1-1 and identified defendant as the shooter. Defendant then stated that the victim "asked for it," and Krass described defendant as "cool and calm" after the shooting. Duncan testified that defendant's "calm" and "relaxed" appearance demonstrated that defendant was not "showing signs of acute distress" after the shooting.

Additionally, as discussed above, Duncan testified that it is important to assess the person's reactions immediately after the violence to determine whether the person was exhibiting "signs of emotional stress" and "emotional reactivity," or whether the person was "not as emotionally affected" by the act of violence. Of particular note on that

point is Krass' testimony that, when Krass had mistakenly told the 9-1-1 operator that the shooting had occurred in building two, defendant corrected Krass and informed him that the correct building was number four and, when the police arrived, defendant got up and said, "it's time to go meet the police." According to Duncan's testimony, "what you can deduc[e] from that is that he's oriented to his situation, like what's happened, what's just taken place, he's processing *** Krass' phone call and correcting that as needed. He knows what he did and what's going to happen." It also showed that defendant "was aware of the wrongdoing of the violence he committed" and that defendant was not under the influence of an EED when he shot the victim. The prosecutor relied on that testimony to argue that defendant's calm demeanor, ability to correct Krass about the building number, and awareness of the wrongfulness of his actions immediately after the shooting was highly persuasive evidence to refute defendant's claim that he was under the influence of an EED when he shot the victim. *See State v. Bement*, 363 Or 760, 779, 429 P3d 715 (2018) ("[E]ven when evidence relates to a central factual issue, *** [it] may be harmless if it is merely cumulative, instead of qualitatively different than evidence presented to the factfinder." (Internal quotation marks omitted.)); *Jones*, 296 Or App at 571-73 (concluding that any error in the admission of the defendant's un-*Mirandized* statements was harmless where it was merely cumulative of other evidence of defendant's state of mind and "other evidence in the record made that point more powerfully," even though "the outcome of the trial turned on whether the jury was persuaded that [the defendant] had not acted in self-defense").

Along those same lines, both Benson and Loudermilk testified that, when they observed defendant shortly after the shooting, defendant's demeanor was "cooperative" and "calm and matter-of-fact" and none of the officers that observed defendant that day noticed any "mental health issues" that raised any concerns. The prosecutor argued that that evidence further demonstrated that defendant was not in such an extreme emotional state during the shooting that would have made defendant unaware of what he had done and the consequences of his actions.

Given defendant's interaction with Krass, defendant's other "I" statement, and the other evidence of defendant's state of mind immediately after the shooting, defendant's single statement, "I shot the guy," was cumulative at most to show that defendant was not under the influence of an EED when he shot the victim, because other evidence also shows that defendant was aware of what he had just done and was able to respond appropriately. There is little likelihood that that statement influenced the verdict. Accordingly, defendant's contention that the trial court erred when it admitted that statement and concluded that Benson did not violate defendant's Article I, section 12, rights does not provide a basis for reversal.

C.  *Admissibility of Defendant's Statement Under the Fifth Amendment*[6]

We now turn to defendant's argument that Benson's question about defendant's involvement in the shooting did not fall within the *Quarles* "public safety" exception under the Fifth Amendment.

In *Quarles*, the Supreme Court concluded "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." 467 US at 657. An officer's questions are justified under the "public safety" exception to the *Miranda* warning requirement if they are "questions necessary to secure their own safety or the safety of the public" rather than "questions designed solely to elicit testimonial evidence from a suspect." *Id*. at 659. The "public safety" exception is "circumscribed by the exigency which justifies it." *Id*. at 658.

Here, the trial court made the following findings with regard to the public safety exception:

"As the first officer on-scene, Benson faced extreme exigencies, primarily occasioned by the facts that he knew that there had been a shooting, that he did not know with certainty that there was only one shooter, that the shooter was still at large, that he had no idea whether the shooter

---

[6]  The Fifth Amendment provides, in part, that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself."

intended further violence, and that he was working with the assumption that the shooter was still armed. As soon as [Benson] saw defendant, who quickly put his hands over his head, Benson ordered *** defendant to turn around, to get on the ground, etc. Benson did not know whether or not defendant was a suspect and was credible in his testimony that, given the circumstances, he would have approached anyone at the scene in the same fashion."

"In order to gain further situational awareness," Benson then asked defendant, "what is your involvement here?" Defendant responded, "I shot the guy," and no further pre-*Miranda* statements were elicited.

The trial court's findings are supported by ample evidence in the record and, under these circumstances, we readily conclude that Benson's question about defendant's involvement in the shooting was justified under the public safety exception to the *Miranda* warning requirement.

We believe that the exigency that occasioned Benson's question was even more compelling than the situation faced by the officer in *Quarles*. In *Quarles*, the officer chased down the defendant in a supermarket and, after momentarily losing sight of the defendant, "ordered him to stop and put his hands over his head." 467 US at 652. The officer frisked the defendant and found an empty shoulder holster for a gun. *Id*. When the officer asked defendant where the gun was without giving defendant *Miranda* warnings, the defendant "was surrounded by at least four police officers and was handcuffed" and "there was nothing to suggest that any of the officers were any longer concerned for their own physical safety." *Id*. at 652, 655. Under those circumstances, the Supreme Court concluded that the officer's question about the whereabouts of the gun was justified under the "public safety" exception because, "[s]o long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it." *Id*. at 657.

Here, Benson arrived on a scene where an unknown shooter was still at large, and Benson did not know if

defendant was the perpetrator, a witness, or a potential victim of the shooting when he encountered defendant in the parking lot. Benson's question was reasonably necessary to "secure [his] own safety or the safety of the public" and it was not "designed solely to elicit testimonial evidence." *Id*. at 659; *see Fleming v. Collins*, 954 F2d 1109, 1113 (5th Cir 1992) (concluding that the officer's questions about the defendant's involvement in an armed bank robbery after finding the defendant shot and being held at gunpoint by a citizen were justified under the public safety exception because the officer confronted a "still-volitile" and "confusing situation" where she "did not know whether [the defendant], or the man who had drawn a gun on him, was the victim or perpetrator of an offense" and "did not know exactly who had been involved in the disturbance at the bank, and 'she didn't want to get shot in the back'"). Furthermore, Benson asked only the question necessary to determine whether the exigency that he faced still existed before Loudermilk read defendant his *Miranda* rights. *See Quarles*, 467 US at 659 (observing that the officer "asked only the question necessary to locate the missing gun before advising respondent of his rights").[7] Thus, Benson's question was justified under the *Quarles* public safety exception for Fifth Amendment purposes.

## III.   CONCLUSION

We conclude that, even if the trial court erred in admitting defendant's statement because it was obtained in violation of defendant's rights under Article I, section 12,

---

[7] Defendant contends that, even if "the requirements of the public safety exception were met, remand is required to determine whether defendant's statements were compelled" because "the trial court did not determine whether defendant's response to the officer's question was voluntary." As noted above, the state filed a motion for a *Jackson/Denno* hearing which requests "a reliable determination on the issue of voluntariness" under the Fourteenth Amendment and argued that defendant's "capacity of self-determination was [not] critically impaired." *Jackson*, 378 US at 376-77. The trial court found that "defendant did not ever intend to conceal the fact that he shot the victim," when it decided that defendant's statement was "voluntarily made and admissible." There is ample evidence in the record to support that finding. Our review of the record also leads us to conclude that defendant's statement, "I shot the guy," was not "the product of a will overborne." *Davis v. North Carolina*, 384 US 737, 742, 86 S Ct 1761, 16 L Ed 2d 895 (1966). Therefore, defendant's statement was not "coerced under traditional due process standards." *Quarles*, 467 US at 655 n 5.

any such error was harmless. Furthermore, defendant's statement was not obtained in violation of defendant's rights under the Fifth Amendment, because the officer's question fell within the public safety exception, as articulated by the United States Supreme Court in *Quarles*, 467 US 649. Accordingly, we affirm.

Affirmed.